**Herbert BEHRENS, as Custodian for Jack Behrens, Plaintiff,**

v.

**WOMETCO ENTERPRISES, INC., Harry Hood Bassett, Elton Cary, Arthur H. Hertz, Van Myers, Robert C. Pew, Frederick H. Schroeder, Charles J. Simons, Stanley L. Stern, Lynn R. Wolfson, Mitchell Wolfson, Jr., and Richard F. Wolfson, Defendants.**

**No. 85–0588–Civ.**

United States District Court, S.D. Florida, Miami Division.

Jan. 8, 1988.

---

Abbey & Ellis, and Wolf, Popper, Ross & Wolf, New York City, William Nortman, Miami, Fla., for plaintiff.

Steel Hector & Davis by Alvin B. Davis, Miami, Fla., for Wometco Enterprises, Inc., Elton Cary, Van Myers, Frederick H. Schroeder, Stanley L. Stern, Lynn R. Wolfson and Mitchell Wolfson, Jr.

Sage, Gray, Todd & Sims by Francis X. Sexton, Jr., Miami, Fla., for Kohlberg, Kravis, Roberts & Co.

Holland & Knight by Chesterfield Smith and Marilyn Holfield, Miami, Fla., for Har-

ry Hood Bassett, Robert C. Pew, Charles J. Simons and Richard F. Wolfson.

## FINAL ORDER APPROVING CLASS SETTLEMENT AND AWARDING ATTORNEYS' FEES

JAMES LAWRENCE KING, Chief Judge.

Before this court is a motion for approval of a class settlement and a motion for an award of attorneys' fees. After giving notice of the settlement to the class and conducting a hearing, the court approves the settlement and awards attorneys' fees.

### FACTS

This suit centers around the "going private" transaction involving Wometco Enterprises, Inc. ("Wometco") and Kohlberg, Kravis, Roberts & Co. ("KKR"), an investment firm. The negotiations for this buyout started in 1982 and lasted until April 1984.

In 1982, KKR first expressed an interest in acquiring Wometco. At that time, Wometco management, led by Mitchell Wolfson, Sr., a co-founder and Chairman of Wometco's Board of Directors, rejected the offer.

Shortly thereafter, Mitchell Wolfson, Sr., died. The remaining Wolfson family members, who together owned approximately one-third of Wometco's stock, decided to sell their holdings. They retained Drexel, Burnham, Lambert, Inc. ("Drexel") to find a buyer for their block of stock. The family members desired to sell their stock at a price of at least $50 a share.

Drexel approached twenty potential purchasers. In June 1983, KKR once again expressed an interest in acquiring Wometco. KKR proposed an acquisition plan in which Wometco shareholders would receive approximately $40 a share. The Wolfson family members rejected this offer because the price was too low.

Between July and September 1983, KKR negotiated with members of Wometco management, Wolfson family members, and Drexel. In September 1983, KKR proposed an offer of $46.50 net cash per share. This proposal was conditioned upon Wometco neither soliciting nor encouraging other acquisition proposals, nor, with specific exceptions, furnishing confidential information to third parties expressing an interest in acquiring Wometco.

These terms were easily met, for Wometco received no other definitive acquisition proposals. Wometco did provide Ferris Traylor, the sole objector to this settlement, with confidential information. Traylor informed the board that he was considering acquiring Wometco for $50 a share, but did not make a bona fide offer.

On September 21, 1983, the Wometco board reviewed the KKR proposal. The board discussed Drexel's preliminary opinion that $46.50 net cash per share was financially fair to the Wometco shareholders. The board approved an agreement in principal with KKR whereby Wometco and certain of its affiliates would be acquired by KKR for $46.50 a share.

The agreement in principal also offered some of the individual defendants management positions and equity participation in the acquiring company. The directors of Wometco who were not offered management or other interests with the acquiring company (hereinafter referred to as "Non-continuing Directors") decided to retain separate counsel to assist them in reviewing a definitive acquisition agreement. The Non-continuing Directors subsequently hired Merrill Lynch Capital Markets ("Merrill Lynch") to evaluate the fairness to Wometco shareholders of the proposed $46.50 net cash per share price.

On December 12, 1983, the board considered the definitive acquisition agreements. These agreements had been negotiated by representatives of Wometco and KKR and approved by the board, including the Non-continuing Directors. Drexel reaffirmed its preliminary opinion that $46.50 net cash per share was financially fair to the Wometco public shareholders. Merrill Lynch also opined that the consideration to be paid was fair to the shareholders. The board then unanimously approved and executed the acquisition agreement.

On March 1, 1984, a proxy statement ("proxy statement") was sent to Wometco shareholders in connection with the KKR acquisition. On March 29, 1984, the shareholders overwhelmingly approved the acquisition. The parties consummated the merger on April 12, 1984.

On March 4, 1985, the plaintiff initiated this class action. The proposed class included all entities that were owners of Wometco common stock on February 15, 1984. The suit named as defendants Wometco, the former directors, and KKR.

The complaint alleged that the defendants violated §§ 10(b), 14(a), and 20 of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b), 78n(a), 78t (1984), by issuing a defective proxy statement. In particular, the plaintiff alleged that the proxy statement included materially false and misleading statements and omitted material facts. The plaintiff also asserted a pendent claim. It alleged that the director defendants breached their fiduciary duties owed to the Wometco shareholders by voting in favor of the acquisition. The thrust of this claim was that the directors placed their own interests before those of the shareholders in approving the acquisition agreement.

On March 7, 1986, the court dismissed KKR from this action. On May 8, 1986, the court approved the stipulation between the parties that dismissed the pendent claims without prejudice so the plaintiff could pursue them in state court.

On July 18, 1986, this court certified a plaintiff class for settlement purposes only. The class consisted of all persons, other than the defendants and their agents, who were owners of Wometco common stock on February 15, 1984. The court also certified Behrens as the class representative.

Shortly thereafter, settlement negotiations began. After extensive negotiations, the parties reached a settlement. The provisions of this settlement are as follows:

Each class member who held Wometco common stock of record on April 12, 1984 (the date of the Wometco/KKR merger), is entitled to receive an amount equal to the product of (1) the "Net Settlement Amount" (the settlement amount plus interest thereon, less attorneys' fees and expenses awarded by the court, including interest thereon) divided by the total number of Wometco common shares held by all record holders; and (2) the number of shares held by such record holder.[1] Under this formula, the settlement amount is $3,975,000 in cash, plus interest. This settlement is currently before the court for approval.

## DISCUSSION

■ Any proposed class settlement and any award of legal fees and costs in a class action requires court approval. *See Piambino v. Bailey*, 757 F.2d 1112, 1139–42 (11th Cir.1985) *cert. denied sub nom, Hoffman v. Sylva*, 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986). While both matters are matters afforded to the district court's discretion, *see generally In re Chicken Antitrust Litigation, Etc.*, 669 F.2d 228, 238 (5th Cir.1982), precedent exists which assists a court in exercising that discretion. After reviewing the law in this area, the court approves the settlement and awards to plaintiff's counsel reasonable attorneys' fees and expenses.

## I. BECAUSE THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE, IT IS APPROVED.

The court finds the proposed settlement to be fair, adequate, and reasonable and, thus, approves the settlement. This conclusion is based upon an analysis of the law surrounding fair and reasonable settlements and a finding that no collusion existed between the parties with respect to the settlement.

---

1. The settlement also provides that in the event a record holder is not the beneficial holder of all the Wometco shares held on April 12, 1985, the record holder shall forward the appropriate sum to such beneficial holder.

The settlement also provides for Wometco to mail the checks made out for the appropriate settlement amount. These checks will be mailed after the settlement is approved.

As a first step toward approval, the court must send notice of the proposed settlement to the class. A court cannot approve a class settlement until notice thereof has been given to all members of the class. *See Rothman v. Gould,* 14 F.R. Serv.2d (Callahan) 1541, 1542 (S.D.N.Y. 1971). The notice affords all class members an opportunity to be heard and oppose the settlement if they so desire. *Id.; see also In re Brown Co. Securities Litigation,* 355 F.Supp. 574, 590–91 (S.D.N.Y. 1973); *Cannon v. Texas Gulf Sulphur Co.,* 55 F.R.D. 308, 312–13 (S.D.N.Y.1972).

Notice of the proposed settlement in this case was sent to the class members. On July 30, 1987, the court ordered the clerk to issue such notice. On July 31, 1987, the clerk of the court issued notice of the proposed settlement that included both the date of the settlement hearing and an outline of each member's right to attend. The hearing was held on September 8, 1987. The record reflects that several shareholders did attend this hearing.

■ The determination of the fairness of a settlement is left to the sound discretion of the trial court. *See In re Chicken Antitrust Litigation, Etc.,* 669 F.2d 228, 238 (5th Cir.1982); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 455 (2d Cir.1974); *In re International House of Pancakes Franchise Litigation,* 487 F.2d 303, 304 (8th Cir.1973). This rule is founded upon the policy that a trial judge is in the best position to evaluate the settlement because he is directly exposed to the litigation. *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 454 (2d Cir.1974).

■ When exercising its discretion, a court should always review the proposed settlement in light of the strong judicial policy that favors settlements. *In re Chicken Antitrust Litigation,* 669 F.2d 228, 238 (5th Cir.1982). "Litigants should be encouraged to determine their respective rights between themselves." *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir.

1977) (citing *United States v. Allegheny–Ludlum Industries, Inc.,* 517 F.2d 826 (5th Cir.1975)). This policy has special importance in class actions with their notable uncertainty, difficulties of proof, and length. *Cotton,* 559 F.2d at 1331; *see also Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir.1976). Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources, *Cotton,* 559 F.2d at 1331, and achieve the speedy resolution of justice, for a "just result is often no more than an arbitrary point between competing notions of reasonableness," *In re Corrugated Container Antitrust Litigation,* 659 F.2d 1322, 1325 (5th Cir.1981), *cert. denied,* 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982).

A court promotes this policy through Fed.R.Civ.P. 23(e). Fed.R.Civ.P. 23(e) requires judicial approval of any class action, but does not provide any standards of approval. *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984). Federal courts have developed the "cardinal rule" that a district court must follow in approving a proposed class settlement. *Cotton,* 559 F.2d at 1330. The district court may approve a settlement only if it "is fair, adequate, and reasonable, and … not the product of collusion between the parties." *Id.* (citing *Young v. Katz,* 447 F.2d 431 (5th Cir.1971)); *accord Bennett,* 737 F.2d at 986; *In re Chicken Antitrust Litigation,* 669 F.2d 228, 238 (5th Cir.1982). After applying this rule to this case, the court approves the settlement.

A. A Court Examines Six Factors in Determining Whether a Class Settlement is Fair, Adequate, and Reasonable.

■ In *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984), the Eleventh Circuit approved the district court's consideration of six factors in determining whether a proposed settlement was fair, adequate, and reasonable.[2] These factors are

(1) the likelihood of success at trial;

---

**2.** These six factors are not the only considerations courts have used to determine whether a settlement is fair, adequate, and reasonable.

Professor Moore advocates a five-factor test for approval: (1) the strength of the plaintiff's case on the merits balanced against the amount of-

(2) the range of possible recovery;

(3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable;

(4) the complexity, expense, and duration of the litigation;

(5) the substance and amount of opposition to the settlement;

(6) the stage of proceedings at which the settlement was achieved.

*Id.; see also In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 212 (5th Cir.1981) (developing a three-step process of approval equivalent to the first three considerations of *Bennett*).

In evaluating these considerations, the district court should not try the case on the merits. *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977). The court can rely upon the judgment of experienced counsel and, absent fraud, "should be hesitant to substitute its own judgment for that of counsel." *Id.* (citing *Flinn v. FMC Corporation,* 528 F.2d 1169 (4th Cir.1975)). With this in mind, the court now analyzes the proposed settlement in light of the *Bennett* considerations.

1. *The likelihood of success at trial was jeopardized by the risks of establishing liability.*

The plaintiff's success at trial could not be guaranteed. The complaint asserted

claims of fraudulent nondisclosure in violation of § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), and Rule 14a–9 promulgated thereunder, 17 C.F.R. § 240.14a–9, as well as § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[3] The facts of this case indicate that the plaintiff would have difficulty in proving these claims.

Section 14(a) and Rule 14a–9 prohibit the use of either a proxy solicitation containing a false or misleading statement or a proxy statement that omits "any material fact necessary in order to make the statements therein not false or misleading." 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9. As a condition precedent to recovery, a plaintiff must prove the materiality of a misstatement or omission. Once materiality is found, the necessary and essential element of causation (between the violation and the injury) is established. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 384, 90 S.Ct. 616, 621–22, 24 L.Ed.2d 593 (1975).

Similarly, a showing of materiality is required to sustain an action under § 10(b) and Rule 10b–5. Section 10(b) and Rule 10b–5 prohibit both the use of a material misstatement of fact and an omission of a material fact in connection with the purchase and sale of any security. 17 C.F.R.

---

fered in settlement; (2) the presence of collusion in reaching a settlement; (3) the reaction of members of the class to the settlement; (4) the opinion of competent counsel; (5) the stage of the proceedings and the amount of discovery completed. 3B Moore's Federal Practice, section 23.80[4] at p. 23–521 (2d ed. 1985). Professor Newberg advances separate criteria: (1) the likelihood of recovery; (2) recommendation and experience of counsel; (3) amount and nature of discovery; (4) future expenses and likely duration of the litigation; (5) recommendation of neutral parties; (6) number of objectors. H. Newberg, 3 Newberg on Class Actions, § 5610 at p. 496 (1st ed. 1978). The Second Circuit utilizes a nine-factor fairness test: (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. *See City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 463 (2d Cir.1974); *Girsh v. Jepson,* 521 F.2d 153, 157 (2d Cir.1975). This court believes the factors utilized in *Bennett* include the best factors from each of these tests.

**3.** The complaint also alleged "controlling persons" liability under § 20 of the 1934 Act, 15 U.S.C. § 78t. As with all secondary liability under the securities laws, a primary violation of those laws must first be found. *Monsen v. Consolidated Dressed Beef Co., Inc.,* 579 F.2d 793 (3d Cir.) *cert. denied,* 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978). Because the class faced a substantial obstacle in establishing primary liability under §§ 14(a) and 10(b), this court need not discuss whether the class could establish this secondary liability.

§ 240.10b–5. In addition, a showing of scienter—the actual knowledge of falsity or the reckless disregard for the truth—must be made. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976).

To establish these claims, the plaintiff primarily relies upon his allegation that the Wometco board failed to disclose the existence of another acquisition offer. This proposed offer was for a price $3.50 higher than the one the board eventually approved. A shareholder of Wometco, Ferris Traylor, allegedly made this offer in July 1983.

Plaintiff's counsel now expresses some doubts as to whether this was a bona fide offer. After conducting what counsel believed was extensive discovery, plaintiff's counsel now maintains Mr. Traylor only expressed a desire to purchase Wometco. Plaintiff's counsel contends that these communications never materialized into a firm offer at any price.

Traylor opposes this characterization of his offer and objects to the settlement. In his Memorandum of Law in Opposition to the Settlement, Traylor states that the offer to purchase Wometco for $50 per share was in writing and that he tendered it directly to Elton Carey, Wometco's chairman. Traylor attaches an attorney's affidavit that states the offer was supported by legitimate investors.

Serious questions exist as to whether Traylor's offer, even as described by Traylor, is a material fact that Wometco was required to disclose. The United States Supreme Court has held that "an omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Whether a reasonable shareholder would find Traylor's offer important to its investment decision is an issue of some doubt, especially when Traylor to this date has not identified the investors behind his offer, or the investors' financial ability to acquire Wometco, or the institutions that were willing to loan him the $880 million needed to acquire the company. This type of information must be disclosed in selective takeover situations under the Williams Act, 15 U.S.C. §§ 78*l* (i), 78m(d), (e), 78n(d)–(f). *See, e.g.,* Schedule 13D. The inability of plaintiff's counsel to obtain this information after extensive discovery casts serious doubts as to whether any of the securities fraud claims could be proved at trial.

Similarly, plaintiff's other grounds for liability under § 14(a) and § 10(b) are questionable. The plaintiff alleged that the proxy statement failed to include other alternatives for the shareholders. A proxy statement, however, need not include the "panoply of possible alternatives" in the course of the action proposed. *See Umbriac v. Kaiser*, 467 F.Supp. 548, 553 (D.Nev. 1979). The plaintiff also alleges that the individual directors did not reveal their improper purpose behind taking the company private. A party so alleging often is frustrated by the holding in *Alabama Farm Mutual Casualty Company, Inc. v. American Fidelity Life Ins. Co.*, 606 F.2d 602 (5th Cir.1979). *Alabama Farm Bureau* held that the securities laws only prevent fraud, and therefore do not require the disclosure of individual motives or subjective beliefs. *Id.* at 610.[4]

If the plaintiff pursued this cause through trial, the likelihood of achieving any success would be at risk. Serious questions of materiality existed, as did substantial legal issues that if resolved would have prevented these claims from going to the jury. In negotiating this settlement, the plaintiff's attorney guaranteed each class member a reasonable recovery.

---

**4.** As a further reason for relief under § 10(b) and § 14(a), the plaintiff alleges that the Wometco Board failed to hire an independent representative to act on behalf of the Wometco public shareholders. The chance of success on this claim is also in doubt. This contention appears to be a breach of fiduciary duty claim and, thus, is not remediable under the federal securities laws, absent a showing of fraud. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 473–74, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977).

### 2. The proposed settlement is in the range of possible recovery that is fair, adequate, and reasonable

The second and third considerations of the *Bennett* test are easily combined. A court first determines the possible range of recovery by resolving various damages issues. The court then determines where in this range of possible recovery do fair, adequate, and reasonable settlements lie. After utilizing this framework, the court finds the proposed settlement to be within the range of possible recovery that is fair, adequate, and reasonable, given the circumstances of this case.

The first step in calculating the possible range of recovery is determining the appropriate standard of damages. In this case, the standard used in calculating damages in Rule 10b–5 and § 14(a) actions is exactly the same.

The appropriate measure of damages in a Rule 10b–5 case is the "out-of-pocket" standard. *See Silverberg v. Paine, Webber, Jackson & Curtis,* 710 F.2d 678, 687 (11th Cir.1983). Under this criterion, a defrauded purchaser of stock may recover the difference between the price paid for the stock and the "fair value" of that stock (i.e., value absent fraud) as of the date of his or her purchase. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 554 (5th Cir.1981), *aff'd in part, rev'd on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

In private § 14(a) actions, the rule for fashioning remedial relief is flexibility. *See J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). A court may use any available remedy "to make good the wrong done." *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946). Money damages can be appropriate, *see Mills v. Elec-*

*tric Auto–Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970), but to show damages, a plaintiff must demonstrate loss causation, *see Dasho v. Susquehanna Corp.,* 461 F.2d 11, 31 (7th Cir.), *cert. denied,* 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972).

The court believes the appropriate measure of damages in this § 14(a) action is the "out-of-pocket" measure used in Rule 10b–5 cases. The class period in this case is only one day. A proxy statement would affect a stock's price on that day in one of two ways. First, if the proxy statement was not misleading, the appropriate price would be the price of the common stock as it existed on that day.[5] On the other hand, if the proxy statement was misleading and the misstatement, if disclosed, would have increased the stock's price, the appropriate value indicative of the effect of the misstatement would be the stock price absent the fraud, or the stock's "fair value." The appropriate measure of damages to a shareholder, therefore, would be the difference between the actual price of the stock on the class day and the stock's "fair value." This is the "out-of-pocket" measure of damages utilized in Rule 10b–5 actions.

To determine the range of possible recovery under this standard, both the price of the Wometco stock on the class day and the "fair value" of the common stock on that same day need to be calculated. For the purposes of determining these values, the court must utilize each side's arguments. For the lowest value of the stock, the court should accept the defendant's arguments of valuation as true.[6] For the highest value of the stock—the so-called "fair value" —the court should adopt all of the plaintiff's valuation arguments. The range of possible recovery, therefore, is the differ-

---

**5.** Obviously, some determination would have to be made as to the actual price that would be used as the stock's price for that day. This determination would not be easy given the heavy volume of trading in a corporation's stock shortly before a major corporate change. Arguments could be made for using the mean price of all trades on that particular day. This court, however, would feel more comfortable using that day's closing price. This position would

allow the general market forces existing on that day to run their course.

**6.** A defendant's valuation could never go lower than the stock's closing price on that day, assuming both that this price takes into acount the general market forces affecting the stock and no other fraud affects the price.

ence between the plaintiff's valuation and the defendant's valuation.

When these guidelines are followed, the range of possible recovery in this case is easily computed. The lowest value for Wometco stock is $46.50, the price of the KKR offer. For the highest value, the court utilizes the plaintiff's argument that $50 per share is the "fair value" of the stock. This price is based on Ferris Traylor's offer, which they claim would have been accepted by the shareholders as Wometco's true value if disclosed.[7] The possible range of recovery in this case, therefore, is the difference between $50 a share and $46.50 a share, or $3.50 a share.

This court must next determine where in this possible range of recovery a fair, adequate, and reasonable settlement would lie, given the facts of this case. In so determining, the court realizes two important maxims: (1) proof of damages in a securities fraud case is always difficult and requires expert testimony, *see In re Warner Communications Securities Litig.*, 618 F.Supp. 735, 744 (S.D.N.Y.1985), *aff'd* 798 F.2d 35 (2d Cir.1986), and (2) the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate, *see City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n. 2 (2d Cir.1974).

In a securities fraud case, expert testimony is needed to fix the amount of damages. *See Burger v. CPC International, Inc.*, 76 F.R.D. 183, 187–88 (S.D.N.Y.1977). Plaintiffs would have produced experts who would have argued that Wometco's "fair value" would have been the market price after the Traylor offer was made public. *See Harris v. American Investment Co.*, 523 F.2d 220, 226–27 (8th Cir.1975), *cert.*

*denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976); *In re Warner*, 618 F.Supp. at 744. Because the market price of a stock tends to move toward the offer price once that offer is publicly announced, these experts would argue that $50 is the appropriate value. The defendants would counter with experts who would argue that the stock's price would not have increased because the Traylor offer was very weak, and if the stock price did rise, general market factors initiated the increase. *See Blackie v. Barrack*, 524 F.2d 891, 909 n. 25 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).[8]

This testimony at best would be pure speculation. In the battle of experts, "it is virtually impossible to predict with certainty which testimony will be credited." *In re Warner*, 618 F.Supp. at 745. Plaintiffs, therefore, would face great difficulty in establishing any damages, not to mention the $.20 a share they would receive in this settlement.

The mere fact that the proposed settlement of $.20 a share is a small fraction of the desired recovery of $3.50 a share is not indicative of an inadequate compromise. A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery. *See City of Detroit v. Grinnell Corp.*, 495 F.2d at 455 & n. 2; *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463–64 (2d Cir.1982); *Weinberger v. Kendrick*, 698 F.2d 61, 65 (2d Cir.1982).

The settlement in this case affords a material percentage recovery to the plaintiff class in light of all the risks of litigation. The class risks not recovering if this

---

7. Another of the major problems associated with the Traylor offer is the uncertainty over whether this $50 a share offer was for cash, or cash and securities, or just securities. Traylor has never clarified the matter, and plaintiff's counsel was unable to do so after extensive discovery. The distinction here is critical. If the offer was for anything other than all cash, the offer would have to be discounted using present value tables. This would reduce the value of Traylor's offer below the $50 face value, perhaps to a value lower than the $46.50 KKR offer; thus, plaintiff's damages would also

be reduced. For the limited purpose of calculating the possible range of recovery in this case, the court assumes the Traylor offer was for $50 cash per share.

8. The defendants would not be responsible for any nonactionable factors, like general market conditions. *See Rolf v. Blyth, Eastman, Dillon & Co.*, 570 F.2d 38, 49 n. 22 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978).

case proceeded to trial, for questions exist as to the materiality of the nondisclosure and as to the "fair value" of the Wometco stock. A recovery at trial of three to five percent of the requested damages is fairly realistic given these uncertainties. *See City of Detroit v. Grinnell Corp.*, 356 F.Supp. 1380, 1386 (S.D.N.Y.1972) (a recovery of 3.2% to 3.7% of the amount sought is "well within the ball park"), *aff'd in part, rev'd on other grounds*, 495 F.2d 448 (2d Cir.1974). The proposed settlement here is well within the possible range of recovery that is fair, adequate, and reasonable.

3. *The policy supporting the quick resolution of long, complex, and expensive litigations supports the settlement of this action.*

The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations. This maxim applies with full force to this case.

As the previous discussion indicates, this case is both factually and legally complex. The action concerns the happenings at several board meetings, including the evaluation of fairness opinions from investment banking houses. The causes of action here concern difficult issues of law, including scienter, materiality, and "controlling person" liability. They require detailed expert testimony in order to be established. Because the very experienced and capable counsel were very thorough in handling these complexities, the court agrees with their assessment that the settlement is fair, adequate, and reasonable. *See Cotton v. Hinton*, 559 F.2d at 1330 (the trial court is entitled to rely upon the judgment of experienced counsel).

Because of its complexity, this case has lasted over two years. The motions for summary judgment and motions to dismiss were recently decided, and the case is only now entering the trial stage. If this case was to be tried, the trial would last several weeks and appeals from a verdict would be likely. By settling this action, the parties have shortened what would have been a very hard-fought and exhausting period of time, which may have realistically ended with a decision similar to the terms of this settlement. The parties, therefore, have avoided adding unnecessary, additional expense to an action that has already been very costly to prosecute and defend.

4. *The sole objector cannot establish that the settlement is unfair, inadequate, or unreasonable.*

Only one shareholder filed an objection to the proposed settlement. The substance of this objection, however, does not disturb the conclusion that the settlement is fair, adequate, and reasonable.

In handling objections to a proposed class settlement, a court must first realize that the number of objectors has little bearing on whether a settlement is fair. A settlement can be fair notwithstanding a large number of objectors. *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977) (approving settlement over objections of counsel purporting to represent 50% of the class); *Bryan v. Pittsburg Plate Glass Co.*, 494 F.2d 799 (3d Cir.) (approving settlement over objections of 20% of the class), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974). On the contrary, a court should focus only on the substance of the objections, but if "a dispute centers on the sufficiency of the settlement fund ... [then] ... majority opposition to a settlement tends to indicate that the settlement may not be adequate." *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir.1982).

Only one objector, Ferris Traylor, appears in this case. Traylor does not challenge the sufficiency of the settlement. He only argues that the "going private" transaction was approved at a lower price than necessary so that a few of Wometco's corporate insiders could engage in profitable "insider trading." Traylor alleges that the board rejected offers substantially in excess of $46.50 per share so that they could participate in this fraudulent scheme. Traylor further states that if this court approves the settlement, it would ratify the fraud.[9] After reviewing this objection, the court finds it to be without merit.

9. Although this sounds like Traylor desires to rescind the KKR/Wometco merger, the com-

The essential element in any insider trading claim is the improper use of nonpublic information. *See generally,* Note, *Leveraged Buyouts, Management Buyouts, Going Private Corporate Control Transactions: Insider Trading or Efficient Market Economics?,* 14 Fordham Urb.L.J. 685 (1987) (authored by Patrick Dunleavy). Nonpublic information is information not generally available to ordinary investors in the marketplace. *See In re Investors Management Co., Inc.,* 44 S.E.C. 633, 643 (1971).

Traylor attaches to his memorandum an exhibit that fails to prove any insider trading. This exhibit contains information acquired from Wometco's SEC Form 4. Wometco filed this form pursuant to § 16(a) of the 1934 Act, 15 U.S.C. 78p(a), which governs insider short-swing profits. All but six of the forty-seven trades listed on Traylor's exhibit occurred after September 21, 1987, which was the date the Wometco/KKR proposed merger was publicly announced. The remaining trades were conducted between Wolfson family members in order to settle various estates. No insider trading in Wometco stock occurred based on these records. Traylor's objection is without merit.

5. *Because the settlement was reached when the discovery process was near ending, the parties were well informed before compromising this action.*

The parties' belief that the proposed settlement is fair is supported by the fact that they reached the compromise after several months of discovery. This discovery led to several motions for summary judgment. These were heavily contested. Only when these motions were denied did the several months of settlement negotiations begin. At this time, both sides were in an excellent position to evaluate their chances of success. In this light, the parties were in the best position to judge the merits of the compromise, and they, like this court, believe it is fair, adequate, and reasonable.

B. This Settlement is Not the Product of Collusion.

This court believes the settlement was achieved in good faith through arms-length transactions and is not the product of collusion between the parties. Counsel for the plaintiffs and the defendants include some of the country's most able and experienced law firms. They acted ethically, zealously representing their clients through the discovery process and in the motions to dismiss and for summary judgment. The settlement provides significant cash to the class, and protects the defendants from a potential risk of greater loss resulting after an expensive trial. Because the proposed settlement is fair, adequate, and reasonable, and is not the product of collusion between the parties, it is approved.

II. UNDER *JOHNSON V. GEORGIA HIGHWAY EXPRESS, INC.,* AN AWARD OF $665,089.80 IN ATTORNEYS' FEES IS REASONABLE.

■ Plaintiff's class counsel jointly move this court for an order awarding attorney's fees for services rendered and for reimbursement of expenses. Plaintiff's counsel seek $750,000 in fees (approximately 19% of the settlement fund) and reimbursement of $31,456.41 in expenses. The fees and expenses rewarded are to be deducted from the settlement fund.

In determining an appropriate award of attorneys' fees, a district court must follow *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974) [10] and its

plaint in this case does not allege any recision claim, although this court does have the power to rescind the deal if properly alleged in a § 14(a) claim. *See Mills v. Electric Auto–Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970) ("possible forms of relief include setting aside the merger").

**10.** A review of the law concerning the awarding of attorneys' fees reveals that *Johnson* is no longer universally accepted. *See Louisville Black Police Officers Organization, Inc. v. City of Louisville,* 700 F.2d 268 (6th Cir.1983). *Johnson* had its genesis in statutorily authorized attorneys' fees cases. *See Kreager v. Solomon & Flanagan, P.A.,* 775 F.2d 1541, 1543 (11th Cir. 1985). In the "common fund" cases, some courts have utilized a percentage method of computing fees. *See In re Warner,* 618 F.Supp. 735, 749 (S.D.N.Y.1985), *aff'd* 798 F.2d 35 (2d

progeny. *Johnson* established twelve factors that a court should consider in calculating a reasonable fee. *Johnson,* 488 F.2d at 717–719. In the decisions following *Johnson,* these factors have been reworked into a three-step process. After utilizing this process, the court awards attorneys' fees of $665,089.80.

*Johnson* dealt with an award of attorney's fees under 42 U.S.C. § 2000e–5(k), the fee award provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. Johnson* 488 F.2d at 716. The Fifth Circuit specifically determined whether the district court's award of fees under this provision was reasonable. *Johnson,* 488 F.2d at 716.

The *Johnson* court vacated the award and remanded to the district court. *Id.* at 720. On remand, the district court was ordered to consider twelve "guidelines" in determining a reasonable fee. These guidelines were

(1) The time and labor required;

(2) The novelty and difficulty of the questions presented;

(3) The skill requisite to perform the legal services properly;

(4) The preclusion of other employment by the attorney due to the acceptance of the case;

(5) The customary fee;

(6) Whether the fee is fixed or contingent;

(7) Time limitations imposed by the client or the circumstances;

(8) The amount involved and the results obtained;

(9) The experience, reputation, and ability of the attorneys;

(10) The undesirability of the case;

(11) The nature and length of the professional relationship with the client; and

(12) Awards in similar cases.

*Id.* at 717–719.[11]

The *Johnson* court then placed the mechanics of applying these factors in perspective. The district court was not to make the prevailing counsel "rich." *Id.* at 719. The award of fees should only "enable an attorney to serve his client effectively and to preserve the integrity and independence of the profession." *Id.* at 720. Mathematical precision in the calculation of a reasonable fee was not required. *Id.*

Although *Johnson* only handled an award of fees under a Title VII, its factors have been applied to attorneys' fee awards in other contexts. *See Kreager v. Soloman & Flanagan, P.A.,* 775 F.2d 1541, 1544 (11th Cir.1985). In *Hedrick v. Hercules, Inc.,* 658 F.2d 1088, 1097 (5th Cir.1981), the *Johnson* factors were used to determine an award of fees under the Fair Labor Standards Act. Of more relevance to this case is the decision in *Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.1980), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1981) wherein the court applied the *Johnson* factors to an award of fees in a class action.

*Johnson* has not withstood the test of time unchanged.[12] In *Hensley v. Ecker-*

---

Cir.1986) (traditionally, courts ... have awarded fees in the 20–50 percent range in class actions"); *Meshel v. Nutri/System, Inc.,* 102 F.R.D. 135, 137 & 140 (E.D.Pa.1984) (finding an award of 25% to be well within the traditional percentage of rewards). These. courts believe that the Supreme Court in *Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984), authorized the use of the percentage method. *See In re Warner,* 618 F.Supp. at 749. Nonetheless, no court in this circuit has solely utilized the percentage method in a common fund case; in fact, the courts in this circuit have consistently followed *Johnson. See, e.g., Piambino v. Bailey,* 610 F.2d 1306, 1328 (5th Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980). Even if the strict

percentage method of awarding fees were utilized in this case, the same result would be obtained.

**11.** Once again, the factors were not uniformly adopted. For example, the Second Circuit advanced six factors: (1) the time and labor expended by counsel; (2) magnitude and capacity of the litigation; (3) risk of the litigation; (4) quality of representation; (5) requested fee in relation to the settlement (6) public policy considerations. *See Grinnell Corp.,* 495 F.2d at 470.

**12.** In *Wolf v. Frank,* 555 F.2d 1213, 1217 (5th Cir.1977), the court noted that literal compliance with the "magic[al] incantations" of *John-*

*hart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983), the Supreme Court considered the appropriate methodology for awarding attorneys' fees under 42 U.S.C. § 1988. The court found the appropriate starting point for determining the amount of a reasonable fee to be "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Id.* The court felt this provided an objective basis on which to make "an initial estimate of the value of a lawyer's services." *Id.* This calculation did not end its analysis. The court specifically allowed a district court to adjust the fee upward or downward upon reviewing other considerations. *Id.* at 434, 103 S.Ct. at 1939–40.

Although the court only examined one such consideration, it did allude to the *Johnson* factors in a footnote. *Id.* at 434 n. 9, 103 S.Ct. at 1940 n. 9. In this note the *Hensley* court specifically allowed a district court to consider the twelve factors, but limited their analysis to the factors not "subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *Id.*

*Hensley* led to the development of the "lodestar" multiple approach in this circuit, which has been utilized by other courts. *See, e.g., City of Detroit v. Grinnell Corp.,* 560 F.2d 1093, 1098 (2d Cir.1977); *In re Warner,* 618 F.Supp. at 747. The first step in this approach is to calculate the time and labor expended by the parties and multiply this by an appropriate fee. The product is called the "lodestar." The next step is to calculate a multiple to be applied to the lodestar. A court determines this multiple, which may increase or decrease the lodestar amount, by reviewing all aspects of the case.

In *Dowdell v. City of Apopka, Florida,* 698 F.2d 1181, 1187 n. 8 (11th Cir.1983), the Eleventh Circuit found no fault with the district court's use of the lodestar approach within the guidelines of *Johnson.* The *Dowdell* district court computed the lodestar amount by combining the first and fifth *Johnson* factors. *Id.* The district court then adjusted the lodestar amount based upon full consideration of the other *Johnson* factors. *Id.*[13]

This court believes the lodestar approach as utilized by *Dowdell* is appropriate when adjusted to bring its analysis in line with the Supreme Court's reasoning in *Hensley.* In calculating the lodestar amount, the court multiplies the first *Johnson* factor, the time and labor required, with the fifth *Johnson* factor, the customary fee. To be consistent with *Hensley,* the particular mathematical units involved must be the number of hours reasonably expended (representing the time and labor) and a reasonable hourly rate (representing the customary fee). With these modifications, the court will first determine the lodestar amount and then consider the other *Johnson* factors to determine an applicable multiple.

### A. The Extent of Legal Services Valued at Current Reasonable Rates Results in a Lodestar Amount of $221,696.60.

The first and fifth factors of the *Johnson* analysis are combined here to calculate the lodestar. This amount is calculated by multiplying the number of hours reasonably expended by each attorney by the reasonable hourly rate charged for similar work by attorneys of like skill in the area. *In re Warner,* 618 F.Supp. at 747.

Three firms have represented the class in this action. The main firm of Abbey & Ellis has expended a total of 1,138.75 hours on this case. The other two firms, Nortman & Bloom and Wolf, Popper, Ross, Wolf & Jones, played minor roles, spending 83 and 98.07 hours, respectfully. The total

---

*son* was not required. This holding led to the future reworking of the *Johnson* methodology.

**13.** Several recent Eleventh Circuit opinions have approved of this practice. *See, e.g., Foster v. Board of School Com'rs of Mobile County,* 810

F.2d 1021, 1023 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987). *Popham v. City of Kennesaw,* 820 F.2d 1570, 1578 (11th Cir.1987).

attorney time expended on this case is 1,319.82 hours.[14]

The second step in calculating the lodestar is placing a value on this expended time. The hourly rate is the appropriate standard. This rate is based on prevailing reasonable standards in the community for attorneys of similar experience handling similar cases. *See Sims v. Jefferson Davis Racing Ass'n.*, 778 F.2d 1068, 1084 (5th Cir.1985). The use of current rates, as opposed to historical rates, compensates counsel for inflation and delay in receipt of payment. *See Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1096 n. 26 (5th Cir.1982) *overruled in part on other grounds, International Woodworkers v. Champion Intern.*, 790 F.2d 1174 (5th Cir.1986). The use of current rates is particularly applicable when legal services are rendered within a two- or three-year period. *See New York State Association for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1154 (2d Cir.1983).

The court finds the current rates utilized by plaintiff's counsel in their affidavits to be reasonable. These rates are facsimiles of the rates charged by similar lawyers in the community for similar types of work. Certainly, a rate of $290 to $300 per hour charged by senior partners in these firms is indicative of market rates. The $65 to $180 hourly rates applied by plaintiff's counsel to the work of their associates also reflects prevailing community standards. The court will utilize these rates to compute the lodestar.

With these two variables, the court calculates the total lodestar amount to be $221,696.60. The partial lodestar for the firm of Abbey & Ellis is $187,712.50. The partial lodestar for the firm of Nortman & Bloom, P.A. is $10,153.00, and the partial lodestar for the firm of Wolf, Popper is $23,831.10.

The numbers added together produce the lodestar amount of $221,696.60.

**B. The Application of the Remaining *Johnson* Factors to this Case Leads to a Lodestar Multiple of Three.**

The court must now calculate an appropriate multiple for the lodestar amount. For these calculations, a district court should consider the remaining ten factors outlined in *Johnson*. This court does not find the need to elaborate on each of these factors, but just indicates the factors that substantially influenced its decision to apply a multiple of three.

1. *The relatively short period of time spent on the novel and difficult issues in this case leads to the conclusion that plaintiff's counsel is very experienced and able.*

The size of the class, the difficult theories of liability, and the always troublesome problems associated with damages all prove that this was an awesome and complex matter masterfully handled by plaintiff's counsel. This justifies an increase in the lodestar amount. *See In re Warner*, 618 F.Supp. at 747. Plaintiff's counsel aptly presented the class' cause from start to finish. Counsel vigorously defended against the motions to dismiss and for summary judgment. Counsel exhibited a high degree of creativity in arguing for the class without wasting any resources. Counsel spent the minimum amount of time necessary to effectively pursue this action. Their work, therefore, was both diligent and efficient. This fact justifies an increase in the lodestar amount. *See Graves v. Barnes*, 700 F.2d 220, 223 (5th Cir. 1983).[15]

Perhaps no better indicator of the quality of representation here exists than the result obtained.[16] The quality of work per-

---

**14.** Plaintiff's counsel have not included within this total the time expended in preparing this fee application.

**15.** As the court in *In re King Resources Co. Securities Litig.*, 420 F.Supp. 610, 631 (D.Colo. 1976) stated: "One thousand plodding hours may be far less productive than one imaginative, brilliant hour." This is an appropriate

maxim that summarizes the little yet effective time expended by plaintiff's counsel in this case.

**16.** This court believes the recent Supreme Court opinion in *City of Riverside v. Rivera*, 477 U.S. 561, 106 S.Ct. 2686, 91 L.Ed.2d 466 (1986) does not eliminate this as a factor from judging the caliber of an attorney's work. *Rivera* only refused to limit an award of attorneys' fees because of the amount of relief realized by the

formed in a case that settles before trial is best measured by the benefit obtained. *In re Warner*, 618 F.Supp. at 748; *Merola v. Atlantic Richfield Co.*, 515 F.2d 165, 168 (3rd Cir.1975). The result obtained is the true benefit to the client. *See In re King Resources Securities Litig.*, 420 F.Supp. 610, 630 (D.Colo.1976).

The results obtained in this case are extraordinary. The class will receive a large class settlement, approximately $3,975,000 plus interest, and will not have to undergo the risks of trial. This recovery is significant given the inherent difficulty of establishing damages in a securities fraud case. The work of counsel in achieving this result, as well as their efficient use of the court's resources, should be rewarded.

2. *The application of a multiple to the lodestar amount where a contingency fee arrangement existed promotes the policies underlying the federal securities laws.*

A significant *Johnson* factor to be considered in a securities fraud case is whether the retainment of counsel is on a contingency basis. Generally, the contingency retainment must be promoted to assure representation when a person could not otherwise afford the services of a lawyer. Most often, this method of representation is the only means a defrauded securities investor can seek assistance from an attorney. Through this type of relationship, the fundamental policies supporting the federal securities laws are promoted.

A contingency fee arrangement often justifies an increase in the award of attorneys' fees. *See Jones v. Central Soya Co., Inc.*, 748 F.2d 586, 591 (11th Cir.1986); *see also Walters v. City of Atlanta*, 652 F.Supp. 755, 759 (N.D.Ga.1985); *aff'd in part, rev'd in part*, 803 F.2d 1135 (11th Cir.1986). *York v. Alabama State Board of Education*, 631 F.Supp. 78, 86 (M.D.Ala. 1986). This rule helps assure that the contingency fee arrangement endures. If this "bonus" methodology did not exist, very

few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing.

In a securities fraud action, a contingency fee arrangement has added significance. The federal securities laws are remedial in nature and, in order to effectuate their statutory purpose of protecting investors and consumers, private lawsuits should be encouraged. *See Eichler v. Berner*, 472 U.S. 299, 308, 105 S.Ct. 2622, 2627–28, 86 L.Ed.2d 215 (1985); *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1470–71, 31 L.Ed.2d 741 (1972); *Superintendant of Insurance of State of New York v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 168–69, 30 L.Ed.2d 128 (1971). If the ultimate effectiveness of these remedies is to be preserved, the efficacy of class actions and of contingency fee arrangements—often the only means of legal representation available given the incredible expense associated with these actions—must be promoted. Because a contingency fee arrangement existed here, an increase in the lodestar amount is justified. *See In re Warner*, 618 F.Supp. at 751.

3. *An award of $665,089.80 in attorneys' fees amounts to 17% of the total settlement fund and, thus, is representative of awards in similar actions.*

A significant *Johnson* factor for class actions is the awards in similar cases. This comparison greatly assists a court in determining whether a fee award is reasonable. *Johnson*, 488 F.2d 714, 719 (1974). A court should focus on both the applicable lodestar multiple used by other courts as well as the amount of attorneys' fees awarded as a percentage of total class recovery. A comparison of this case with other equally complex class actions supports the application in this case of a lodestar multiple of three.

plaintiff. *Id.* Consistent with this holding is a court's increasing the amount of fees because an attorney's work resulted in the plaintiff class obtaining a large recovery. Under no circum-

stances can *Rivera* be read as preventing a court from looking at the result obtained as one of the factors it uses in judging the quality of an attorney's work.

In cases as complex as this, with risks of establishing liability as great as in this case, and with legal representation as fine as it was here, a lodestar multiple of three appears to be average. *Cf. In re Warner,* 618 F.Supp. at 749 (noting that a lodestar multiple of 2.26 "appears to be at the lower end of the range of multiples used in other cases"). The range of lodestar multiples in large and complicated class actions runs from a low of 2.26, *see e.g., In re Warner,* 618 F.Supp. at 749, to a high of 4.5, *see, e.g., Municipal Authority of Bloomsburg v. Pennslyvania,* 527 F.Supp. 982, 999–1000 (M.D.Pa., 1981) (noting that this unprecedented and extremely high multiple was "warranted only because of the peculiar facts in this case"). Most lodestar multiples awarded in cases like this are between 3 and 4. *See, e.g., In re General Public Utilities Securities Litig.,* [1983–84 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 99,566 at 97,232 (D.N.J.1983) (multiple of 3.45); *Pacific Plumbing Supply Co. v. Crane Co.,* [1982–1 Trade Cases] (CCH) paragraph 64,473 at 72,649 (W.D. Wash.1982) (multiple of 3.0); *In re Cenco, Inc. Securities Litig.,* 519 F.Supp. 322, 326–028 (N.D.Ill.1981) (multiple of 4.0); *Keith v. Volpe,* 86 F.R.D. 565, 575–77 (C.D. Cal.1980) (multiple of 3.5); *Miller v. Fisco, Inc.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 96,348 at 93,187 (E.D.Pa. 1978) (multiple of 2.8); *Fried v. Utilities Leasing Corp.,* [1976–79 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 95,695 at 90,429 (E.D.Pa.1976) (multiple of 4.0); *In re Gypsum Cases,* 386 F.Supp. 959, 1974–2

Trade Cases (CCH) paragraph 75,272 at 97,775 (N.D.Cal.1974) (multiple of 3.0). The application of a multiple of 3.0 here compares favorably with the multiples used in these other complex cases.

Similarly, the award of attorneys' fees amounting to 17% of the settlement compares favorably to the percentages awarded in similar cases. "Traditionally, courts ... have awarded fees in the 20% to 50% range in class actions." *In re Warner,* 618 F.Supp. at 749.[17]

These favorable comparisons, along with the other factors discussed, indicate that a lodestar multiple of 3 is reasonable. The expertise of counsel, and the need to promote the federal securities laws through contingency fee arrangements, require this court to increase the lodestar amount. The application of the multiple leads to a total reward of $665,089.80 in attorneys' fees.

In addition, plaintiff's counsel is entitled to be reimbursed from the class fund for the reasonable expenses incurred in this action. *See Municipal Authority of the Town of Bloomsburg v. Commonwealth of Pennsylvania,* 527 F.Supp. 982, 1000 (M.D. Pa.1981). In summary, these expenses include the necessary costs associated with any action: travel, depositions, filing fees, postage, telephone, and copying. The $31,-456.41 paid by the plaintiff's counsel for these expenses is fair and reasonable. Plaintiff's counsel is to be reimbursed from the settlement fund for $31,456.41.

**17.** *See, e.g., In re New York City Municipal Securities Litig.,* Fed.Sec.L.Rep. (CCH) paragraph 91,-419, at 98,085 (S.D.N.Y.1984) [Available on WESTLAW, 1984 WL 2411] (fees and disbursements amounting to approximately 33% of the $13,450,000 settlement); *Weinberger v. Flow General, Inc.,* [1984 Transfer Binder] Fed.Sec.L. Rep. (CCH) paragraph 91,541 at 98,731 (S.D.N.Y.1984) [Available on WESTLAW, 1984 WL 2437] (25% of settlement); *Amsterdam v. Turbodyine Corp.,* [1981 Transfer Binder] Fed.Sec.L. Rep. paragraph 97,976 at 91,031 (S.D.N.Y.1981) (29% of the settlement); *Richardson v. White Weld & Co., Inc.,* [1981 Transfer Binder] Fed. Sec.L.Rep. (CCH) paragraph 97,968 at 90,980 (S.D.N.Y.1981) (27% of settlement); *Van Gemert v. Boeing Co.,* 516 F.Supp. 412, 418–22 (S.D.N.Y.1981) (22% of settlement); *Clark v. Cameron–Brown Co.,* [1981 Transfer Binder]

Fed.Sec.L.Rep. (CCH) paragraph 98,014 (M.D.N. C.1981) (35% of settlement); *In re Franklin Nat'l Bank Securities Litig.,* [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 97,571 at 97,-988 (E.D.N.Y.1980) (34% of settlement); *Baron v. Commercial & Industrial Bank of Memphis,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 97,132 at 96,244 (S.D.N.Y. 1979) (36% of settlement); *Steinberg v. Casey,* 470 F.Supp. 471, 480 (S.D.N.Y.1979) (25% of settlement); *Munsey Trust v. Sucor, Inc.,* 457 F.Supp. 924, 928 (S.D.N.Y.1978) (fees and expenses amounting to 30% of settlement); *In re Scientific Control Corp.,* 80 F.R.D. 237, 243–44 (S.D.N.Y.1978) (almost 30% of the recovery); *Adams v. Standard Knitting Mills, Inc.,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 96,377 at 93,307–09 (E.D.Tenn.1978) (almost 30% of verdict after trial).

## CONCLUSION

This very handsome settlement for this class is approved. The defendant Wometco is to pay to the class $3,975,000 plus interest. For bringing this action and reaching this fine settlement, plaintiff's counsel is awarded $665,089.80 in attorneys' fees and is authorized to have $31,456.41 paid to them from the settlement fund in order to reimburse counsel's expenses in this action.

Accordingly, it is

ORDERED AND ADJUDGED that the proposed class settlement be, and the same is hereby, APPROVED. Class counsel is awarded $665,089.80 in attorneys' fees, and is to be reimbursed for their expenses in the amount of $31,456.41.