**Edward LIPUMA, on behalf of himself and all others similarly situated,**
**Plaintiff,**

v.

**AMERICAN EXPRESS COMPANY,**
**a New York corporation, et al.,**
**Defendants.**

No. 04–20314–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Dec. 20, 2005.

James S. Baum, Schrag & Baum, Berkeley, Ca, Michael L. Schrag, Thomas F. Schrag, David S. Stellings, Lieff Cabraser Heimann, Bernstein, New York City, Irving Bizar, Ballon Stoll Bader & Nadler, New York City, Kevin S. Landau, Garwin Bronzaft Gerstein, Fisher Llp, New York City, Bruce E. Gerstein, Joy Ann Bull, Lerach Coughlin Stoia Geller, Rudman & Robbins, San Diego, CA, Adam M. Moskowitz, Kozyak Tropin & Throckmorton, Coral Gables, FL, Thomas A. Tucker Ronzetti, Roy Lewis Weinfeld, Roy L. Weinfeld PA, Miami, FL, Cory S. Fein, Caddell & Chapman, Houston, TX, Michael A. Caddell, Spencer Marc Aronfeld, Coral Gables, FL, Sanjay M. Ranchod, Girard Gibbs & De Bartolomeo, San Francisco, CA, A. J. De Bartolomeo, Daniel C. Girard, Thomas Emerson Scott, Jr., Cole Scott & Kissane, Miami, FL, Cynthia B. Chapman, Spencer Marc Aronfeld, Sanjay M. Ranchod, A. J. De Bartolomeo, Daniel C. Girard, for Plaintiffs.

## ORDER APPROVING SETTLEMENT OF CLASS ACTION LAWSUIT

ALTONAGA, District Judge.

**THIS CAUSE** came before the Court on Monday, March 14, 2005, for an evidentiary hearing, concerning the parties' request that the Court approve the proposed class action settlement, and the intervenors' objections thereto. Earlier, in October 2004, the Court had given preliminary approval of a class action settlement, pursuant to Fed.R.Civ.P. 23(b)(3). [D.E. 153, 155]. The evidentiary hearing was held pursuant to Rule 23(e)(1)(A), Fed.R.Civ.P., which mandates judicial review of any "settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class." The Court has carefully considered the parties' written submissions, including post-hearing memoranda and exhibits, the evidence and arguments presented, and applicable law. For the reasons that follow, the proposed class action settlement is approved in full.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On August 23, 2003, in the Eleventh Judicial Circuit in and for Miami–Dade County, Florida (hereinafter the "State Action"), Plaintiff, University of Miami professor Edward LiPuma ("LiPuma"), on behalf of himself and others similarly situated, filed this lawsuit challenging Defendants, American Express Company, American Express Travel Related Services, Inc.,

and American Express Centurion Bank's (hereinafter collectively referred to as "American Express[']"), foreign currency exchange practices. The State Action was removed to this Court on February 10, 2004. Shortly thereafter, on February 13, 2004, the parties presented their Joint Request for Expedited Hearing on Parties' Joint Motion for Preliminary Approval. [D.E. 3]. Needless to say, much preparation, informal and formal discovery, and settlement negotiations had taken place prior to the Joint Motion for Preliminary Approval. American Express' foreign currency conversion practices, the pleadings framing the issues, the history of what preceded this case, the terms of the proposed settlement, matters addressed at the final fairness hearing, and post-hearing submissions are therefore important to consider and understand as they bear upon the assessment of the proposed class action settlement.

### A. American Express' Foreign Currency Conversion Practices and Disclosures

When a U.S. American Express cardmember uses his or her American Express card to purchase goods or services in a foreign currency, American Express pays the merchant in foreign currency but translates that foreign transaction to U.S. Dollars for billing and payment purposes. During the relevant time period, this conversion was accomplished by American Express using a currency exchange rate, which it unilaterally selected from either an interbank, tourist, or official rate, and then making an adjustment of up to 2% in accordance with its cardmember agreements. Interbank rates, which are used in most countries, are wholesale rates used in large-volume currency trading between major financial institutions. Interbank rates are not available to consumers, and these rates are more favorable than what consumers may obtain through the retail currency trading market.

American Express did not purchase foreign currency every time a cardmember made a foreign currency purchase. Rather, American Express bought and sold currency in the interbank foreign exchange markets, based on American Express' aggregate foreign currency positions.

Between March 1999 and October 2002, American Express made additional adjustments to interbank rates in certain markets. These competitive adjustments were made during discrete time periods in addition to the 2% rate adjustment. All competitive adjustments were eliminated by American Express in October 2002 and are no longer used. American Express has estimated that the revenue received from application of this competitive adjustment to U.S. cardmember transactions was less than $45,000,000.00.

As it pertains to Turkish Lira, in January 2000 American Express began to add 4 to the last digit used by its data processing systems before rounding transactions in Turkish Lira, which had the effect of causing the last digit to round up more often than it rounded down. In the aggregate, this practice resulted in adding approximately 8% to cardmember transactions in Turkey. Because of devaluation of the Lira during the relevant time period, the 2% rate adjustment was not applied in Turkey and the net effect was approximately 6%. In September 2002, the number added to the last decimal place was reduced from 4 to 2, which reduced the impact of rounding up more often than rounding down to approximately 3%, with a net effect of approximately 1% because the 2% rate adjustment was not applied. In December 2004, American Express ceased this practice, which had only been used in Turkey, and resumed normal

rounding. The approximate aggregate effect of the earlier practice in Turkey was to increase cardmember transaction amounts by approximately 6.58%, with a net effect of 4.58% for the period between February 1999 and December 2004.

Beginning from at least March 1997, and during the time period relevant to this litigation, American Express' cardmember agreements contained the following provision describing the foreign currency conversion practice of American Express:

> CHARGES MADE IN FOREIGN CURRENCIES
>
> If you incur a charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents at a rate set by us based on an interbank, tourist or (where required by law) official rate, increased in each instance by [1–2%].[1] This rate may differ from rates in effect on the date of your charge. Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

(Declaration of Gillen Clements ("*Clements Decl.*"), ¶ 6, Ex. A (exemplar agreement)[D.E. 266] ). This language was modified in September 2003 to read as follows:

> **Transaction Made in Foreign Currencies**
>
> If you incur a Charge in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents. Unless a particular rate is required by applicable law, you authorize us to choose a conversion rate that is acceptable to us for that date. Currently, the conversion rate we use for a Charge in a foreign currency is no greater than (a) the highest official conversion rate published by a government agency, or (b) the highest interbank conversion rate identified by us from customary banking sources, on the conversion date or the prior business day, in each instance increased by 2%. This conversion rate may differ from rates in effect on the date of your Charge. Charges converted by establishments (such as airlines) will be billed at the rates such establishments use.

(*Id.*, ¶ 7, Ex. B (exemplar agreement) [D.E. 266] ).

The existence of the 2% foreign transaction fee was not disclosed in cardmember billing statements or other materials. However, the line item for each foreign charge would indicate the amount of the charge in foreign currency and the amount of the charge as converted by American Express into U.S. Dollars.

## B. The Claims Made and Defenses Asserted

Plaintiffs' initial class-action Complaint described the lawsuit as a

> civil action seeking restitution, damages, injunctive relief and other relief arising out of the unlawful actions of American Express in imposing a hidden 2% transaction fee on its cardholders for purchases of goods or services which are denominated in non-U.S. currency. Despite the fact that American Express touts the "global acceptance" of its cards that "open[ ] doors for cardholders at millions of establishments ... around the world," American Express never discloses the existence or amount of this fee (referred to herein as the "foreign currency transaction fee") in cardholder billing statements or its applications or solicitations to prospective cardholders. Indeed, American Express actively conceals the foreign currency transaction fee from its cardholders by embedding

---

1. The rate adjustment varied at different times.

**1302**

the amount of the fee in the transaction amount, which is shown on the cardholder's bill in U.S. dollars. Thus, because the 2% fee and the transaction are combined on the cardholder's bill, there is no indication on the billing statement that American Express imposes the foreign currency transaction fee.

(Complaint ("*Comp.*"), ¶ 2 [D.E. 1]).

Again, in paragraph 15 of the Complaint, Plaintiffs repeat that "American Express imposes a hidden 2% foreign currency transaction fee on its cardmembers for purchases of goods and services which are denominated in non-U.S. currency." (*Comp.* ¶ 15 [D.E. 1]). In paragraph 17, it is repeated that "[a]fter converting the amount of the foreign charge to U.S. dollars, American Express adds a 2% foreign currency transaction fee, which it embeds in the transaction amount in U.S. dollars where it is invisible to consumers.... This hidden foreign currency transaction fee is the only fee that is fixed in the transaction amount in this manner." (*Id.* ¶ 17 [D.E. 17]). Paragraph 18 emphasizes that "[t]he business practice of embedding or hiding the foreign currency transaction fee in the transaction amount on billing statements misleads consumers as to the existence and amount of any foreign currency transaction fee because the fee is concealed." (*Id.* ¶ 18 [D.E. 1]).

The Complaint tackles head on, and challenges, American Express' "unconscionable limitations on liability and arbitration provisions ('legal remedies limitations')." (*Id.* ¶ 27 [D.E. 1]). Since April 1999, American Express' cardmember agreements have included an arbitration provision which provides, in pertinent part:

IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM, OR TO ENGAGE IN PRE-ARBITRATION DISCOVERY EXCEPT AS PROVIDED FOR IN THE CODE OF PROCEDURES OF THE NAF, JAMS, OR AAA, AS APPLICABLE. FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. EXCEPT AS SET FORTH BELOW, THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.

There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers or other persons similarly situated; provided however, that the claimant's individual Claim would be subject to this Arbitration Provision. Furthermore, claims brought by or against a Cardmember(s) of one Account may not be joined or consolidated in the arbitration with claims brought by or against any other Cardmember(s) of any other Account, unless otherwise agreed to in writing by all parties.

\* \* \* \* \* \*

**Note to California residents:** This Arbitration Provision shall not apply to you....

(*Clements Decl.*, ¶ 9, Ex. D [D.E. 266]).

Anticipating that the foregoing legal remedies provisions would constitute a material part of the defense to the lawsuit,

the initial Complaint challenged these provisions as "unlawful, unconscionable and unenforceable as against public policy." (*Comp.* ¶ 28 [D.E. 1] ). With the premise that the foregoing legal remedies clauses were not applicable, the Complaint proceeded to state two causes of action: the first for Deceptive and Unfair Trade Practices under the Florida statute, §§ 501.201–501.213, in that American Express failed to adequately disclose the existence of the foreign currency transaction fee; and the second for unjust enrichment as a result of American Express receiving the foreign currency transaction fee. This Complaint, as is addressed below, was later amended with assistance from American Express.

### C.  The Discovery and Settlement Process Before the Final Fairness Hearing

Prior to the filing of this suit, some members of Plaintiffs' Class Counsel, Dennis Stewart of Hulett Harper & Stewart, Chris Burke of Lerach Coutghlin, *et al.*, and Allan Steyer and Scott Mccrae of Steyer Lowenthal, *et al.*, had litigated a six month trial against Visa and MasterCard in California state court in the case of *Schwartz v. Visa International Corp.*, 2003 WL 1870370 (Cal.Sup., Apr. 7, 2003) (hereinafter the "*Schwartz* case"). In April of 2003, the trial court in *Schwartz* determined that Visa and MasterCard had committed unfair and deceptive business practices under the California Unfair Competition Law, and the California Business & Professions Code, Section 17200, *et seq.*, by failing to require their member banks to adequately disclose a 1% surcharge they required be applied to all transactions in foreign currencies. There was extensive press coverage of the initial success of the *Schwartz* case,[2] including

reference to an $800 million refund ordered by the court.

The *Schwartz* case yielded much information concerning how major credit card companies, including American Express, processed foreign transactions by U.S. cardholders. American Express documents and witnesses were subpoenaed by Visa and MasterCard as part of the pretrial discovery process, and depositions of American Express executives were taken. American Express' conversion rates were the subject of testimony by plaintiffs' and defendants' experts in the *Schwartz* trial. Economists opined on the differences between the American Express, Visa and MasterCard rates. There was testimony about how American Express processed foreign transactions, how American Express rates compared to Visa and MasterCard rates, and how the credit card companies managed their foreign currency exposure by applying spreads to wholesale rates to generate revenues from them.

Notwithstanding that American Express, in contrast to Visa and MasterCard, expressly disclosed its 1–2% rate adjustment in its cardmember agreements, because of the success of the *Schwartz* case, several lawsuits besides this one were filed against American Express. The first of these was *Environmental Law Foundation v. American Express Co.*, in the Superior Court of California, County of Alameda, Case No. BG03089146, filed on March 28, 2003 (the "*ELF* action"). Plaintiff, William S. Barrett ("Barrett"), a plaintiff in this case, was also a named party in the *ELF* action. The Barrett complaint filed in *ELF* concerned itself with " . . . a hidden transaction fee [which] was 1% . . . American Express raised the amount of this hidden fee to 2% . . . . "

**2.**  The *Schwartz* case is not final, as there are     still ongoing appellate proceedings.

Other cases filed against American Express include the following: *Arumbula v. American Express Co.*, District Court of Cameron County, Texas, Case No.2003–05–2448–D (May 16, 2003); *Bildstein v. American Express Co.*, Supreme Court of Queens County, New York, Index No. 15029–03 (July 2003)(*"Bildstein "*); *Fuentes v. American Express Travel Related Services Co., Inc.*, District Court of Hidalgo County, Texas, Case No. C–848–03–B (May 2003)(*"Fuentes "*); *Janowitz v. American Express Co., et al.*, Circuit Court of Cook County, Illinois, Case No. 03CH 15385 (September 15, 2003); *Rubin v. American Express Co.*, Circuit Court of Madison County, Illinois, Case No. 03–L–530 (April 22, 2003); *Wick v. American Express Co.*, Circuit Court of Cook County, Illinois, Case No. 03CH07811 (May 2, 2003)(*"Wick "*); *Paul v. American Express Co.*, Superior Court of California, County of Orange, Case No. 04CC00015 (January 13, 2004)(*"Paul "*); and *Ball v. American Express Co.*, Superior Court of California, County of San Joaquin, Case No. CV024562 (August 17, 2004)(*"Ball "*).

Several of the referenced cases are noteworthy for the information gleaned and progress made toward a global resolution of the present claims. In *ELF,* discovery explored American Express' use of a 1–2% rate adjustment or "fee" for transactions made in foreign currencies. Discovery also explored other American Express foreign currency conversion practices, such as, the manner of ascertaining or setting the particular interbank, tourist or official rate of exchange used as a basis for the BASE RATE used to convert foreign currency denominated charges into U.S. dollars; the methodology by which American Express arrived at the actual BASE RATES used to convert charges initiated by a U.S. cardholder in a foreign currency; the BASE RATES and the interbank tourist or official rate on which the BASE RATES were based with respect to the 25 highest volume currencies; and studies and reports regarding currency conversion issues or market research and competitive studies related to currency conversion rates or services. (Declaration of Scott M. Pearson ("*Pearson Decl.*"), ¶ 4 [D.E. 327] ). Discovery was also sought concerning losses and gains from and costs associated with American Express' foreign currency conversion operations. (*See id* ).

Depositions taken in the *ELF* case also briefly touched on American Express' foreign currency conversion practices, apart from the 2% fee. In particular, Peter Sisti, the senior American Express Treasury officer responsible for American Express' practices, was questioned as follows about American Express' rate-selection methodologies, competitive positioning studies, and conversion practices:

Q. Okay. All right. Now, what is the name of the program, if it has a name, that is utilized in order to arrive at these conversion rates?

A. Rate Selection Program, RSP.

Q. Is that a proprietary program to American Express?

A. Yes, it is.

Q. There's probably 10 questions I should ask now, but, to my level of sophistication, I don't even know the first one. Who is responsible for that program, whether it needs to be updated or changed or -

A. My UK team.

(Intervenors' Notice of Filing, Under Seal, Documents Presented to the Court During March 14–15, 2005 Fairness Hearing; Exs. 13 & 15; January 13, 2004 excerpt of Peter Sisti deposition taken in *ELF* ).

The *Paul* action challenged certain rounding practices employed by American Express when converting transactions

from Turkish Lira to U.S. dollars. The *Ball* action challenged American Express' failure to adequately disclose the costs incurred in converting foreign currency. The plaintiff in the *Ball* case alleged that American Express profited by purchasing its currency at a lower interbank rate than it offered cardmembers, a claim referred to as the "spread" claim.

Faced with all of these lawsuits around the country, American Express early decided and expressed that it wanted to negotiate a global settlement of all foreign currency conversion cases. It began negotiating with the lawyers in the *ELF* action, after the plaintiffs in that case made a settlement proposal in April of 2003. On November 10, 2003, the *ELF* plaintiffs and American Express participated in a mediation before the Honorable Layn R. Phillips, a former United States District Judge. The failed negotiations included a rejection by American Express of plaintiffs' demand that American Express automatically credit, or provide direct payment of, settlement proceeds to class members along with American Express' insistence that class members be required to submit claims in order to receive payments. Negotiations continued until December 2, 2003 through Judge Phillips, and eventually failed.

Dennis Stewart, Mr. Barrett's attorney, had this to say about the failed mediation in the *ELF* action:

> 10. ... At some point during the afternoon, I was invited to a private conversation with American Express's counsel and the mediator. At that meeting, American Express's counsel told me, in effect, that there were other cases out there and that plaintiffs had better take a more pliant settlement position or American Express would settle the case

somewhere else. I was offended by this approach, and in the mediator's presence, told counsel so. I took this to be a direct invitation to put plaintiffs' counsels' interest ahead of the class' interest and to attempt to reverse auction the value of this case to the class downward so American Express would settle the case with us and not other counsel. I informed counsel to tell her client that we would not bargain on that basis. ...

(Intervenors' Notice of Filing Documents Presented to the Court During March 14–15, 2005 Fairness Hearing; Ex. 42; Declaration of Dennis Stewart in Support of Plea in Intervention [D.E. 344]).

During a December 2, 2003 hearing in the *Bildstein* action,[3] the court suggested that the parties discuss settlement. Because American Express believed a global settlement would draw objections from other lawyers in the other then-pending cases, American Express suggested that lawyers from another conversion case should be included in the negotiations to encourage support for any settlement. Counsel in *LiPuma* were thus invited to participate.

LiPuma's counsel insisted on discovery in advance of any mediation, and American Express provided thousands of pages of documents relating to American Express' foreign currency conversion practices, deposition transcripts from related cases and discovery from the *ELF* action. American Express allowed LiPuma's attorneys to interview Gillen Clements, the chief compliance officer for U.S. card products, and Peter Sisti. LiPuma's counsel, who was familiar with the *Schwartz* decision, questioned the witnesses about American Express' revenues generated from foreign transaction charges, costs as-

---

**3.** The hearing concerned American Express' motion to compel arbitration in accordance with the arbitration provision contained in the standard cardmember agreements.

sociated with the foreign transaction charges, marketing, disclosure and regulatory issues. Ultimately, on December 15, 2003, the parties met in New York City and participated for two days in mediation before former United States District Judge and United States Attorney, the Honorable Herbert L. Stem.

American Express presented Plaintiffs with the defenses it would be asserting should this litigation continue: that the class action was precluded by the arbitration provision, that American Express properly disclosed its foreign currency conversion practices in its agreements, that cardmembers benefitted from American Express' foreign currency conversion practices because cardmembers did not have access to the favorable rates American Express had access to, that the disclosures sought were not required under applicable law, and that the rates used by American Express were not subject to any federal or state regulation. By the end of the second day, the parties had agreed upon the general terms of a nationwide settlement. The essence of the agreement would provide for significant disclosure changes by American Express, payments of up to $66,000.00 (less attorney's fees and charitable contributions) to class members, and a release of all foreign currency conversion claims against American Express.

Judge Stern had this to say about the *LiPuma* mediation:

3. It has come to my attention that counsel for a purported class member has alleged that counsel for the parties "colluded" in reaching the settlement. I submit this affidavit to specifically address those allegations. Based on my observations as mediator, such allegations are entirely baseless. I observed no signs of collusion or unethical conduct.

4. It is my observation that Defendants and Plaintiffs were represented by highly competent, reputable and ethical counsel who negotiated vigorously and at arms-length for their respective party's interests.

(Affidavit of Herbert J. Stern, Esq., Exhibit B to Class Plaintiffs' Memorandum in Support of Final Approval of the Proposed Settlement [D.E. 268] ).

Class Plaintiffs and Defendants maintain that the mediation statement prepared for Judge Stern by LiPuma's counsel challenged American Express' foreign currency conversion practices, *including* the lack of prominent disclosure of the 2% foreign transaction fee, which inhibited class members who had more than one credit card in their selection of which credit card to use when making purchases in foreign currency. A close scrutiny of the statement, however, reveals that LiPuma's counsel was only challenging the 2% surcharge:

... This case concerns a 2% surcharge American Express ("AmEx") imposes on foreign purchases but never reveals to cardholders. Instead AmEx bundles the charges in a single figure that includes the foreign conversion rate....

The Plaintiffs here are suing American Express in a class action to end its deceptive foreign currency surcharge. The Plaintiffs will establish that disclosure of the surcharge is highly material to consumers, and easily disclosed in its billing statements....

(Intervenors' Notice of Filing, Under Seal, Documents Presented to the Court, Ex. 7). The statement did include reference to the fact that "American Express converts the purchase amount from foreign currency into U.S. dollars using an exchange rate which it unilaterally determines." (*Id.;* Joint Declaration of T. Ronzetti, C. Burke, K. Landau and A. Steyer in Support of

Motion for Final Approval ¶ 27)("*Joint Decl.*")([D.E. 271]).

The two months that followed consisted of daily meetings to work out the details of the settlement. Significant changes were made to the settlement to address issues raised by LiPuma's counsel. American Express continued to provide LiPuma's counsel with copies of all discovery produced by American Express in related proceedings; the deposition transcripts of Mr. Sisti and Mr. Clements, deposed in the *ELF* action; and documents (approximately 5,000 pages). American Express did not reveal to the *Bildstein* and *LiPuma* lawyers the details of the *ELF* negotiations, and did not have the lawyers bid against each other.

On February 10, 2004, LiPuma filed his First Amended Complaint, alleging for the first time a claim for breach of the Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.*, and the case was promptly removed the same day to this Court. American Express' counsel had participated in suggesting revisions to the pleading, e-mailing LiPuma's counsel drafts of allegations that should be included encompassing the full breadth of American Express' rate selection practices. As indicated by Scott Pearson, counsel for American Express, in a January 8, 2004 e-mail to counsel for the Plaintiff class, "The amended complaint needs to attack the methodology of setting rates in addition to the 'fee.' This can be accomplished with minor changes in several places." (Intervenors' Exhibit No. 5 [D.E. 345]).

On February 13, 2004, the parties sought and later obtained preliminary approval in this case, from the predecessor judge before whom the case was then pending. The case was subsequently reassigned to the undersigned, and the February 17, 2004 order granting preliminary approval [D.E. 7]was vacated for procedural reasons by order dated April 29, 2004. [D.E. 84].

The preliminary approval order stayed the competing actions under the All Writs Act. After preliminary approval was granted, class representative William S. Barrett of the *ELF* action, and the plaintiffs in the *Fuentes, Paul,* and *Ball* cases, sought, and were granted leave to intervene in this case. Mr. Barrett charged the parties in *LiPuma* with inappropriate conduct in reaching the settlement, and sought to have the agreement set aside. Pamela Paul's request for leave to intervene related to her challenge to rounding practices in Turkey. David Ball's request pertained to his concern that a settlement would impinge on the rights of his California suit, filed in August of 2004 (after the initial settlement was reached here), in which he alleges that American Express profited by purchasing its currency at a lower interbank rate than it offered its cardmembers—the "spread claims"—in contravention of contractual obligations to cardholders.

A hearing was held before the undersigned on April 23, 2004. Mr. Barrett's counsel represented that they had been "confronted with a situation where we were side-swiped and found out about a settlement we didn't feel was in the best interest and we have done, under the circumstances, the best that we could to enhance the settlement." (Trans. of April 23, 2004 hearing, at 36:13–16). Nonetheless, at the hearing Mr. Barrett withdrew his objections and was added as an additional class representative. In addition, Mr. Barrett's counsel became associated as co-counsel for the settlement class, and the *Fuentes* plaintiffs withdrew their objections. Negotiations had resulted in an agreement to increase the minimum payout provided under the terms of the initial *LiPuma* settlement, from $2 million to $30

million, and an increase in the maximum amount payable to cardholders from $66 million to $75 million.

The $75 million also included a $500,000.00 charitable contribution, representing the statutory damages provided under the Truth in Lending Act. Under the agreement, Plaintiffs' counsel could also apply for an award of attorney's fees and costs not to exceed $11,000,000.00. The parties also agreed that the attorney's fees would be subtracted from the $75 million maximum amount payable,[4] rather than from the guaranteed amount of $30 million. If there were any funds remaining after payment of claimants, charities and attorney's fees, the remainder would revert back to American Express.[5]

The proposed settlement also contemplated that American Express would revise its disclosures relating to its foreign currency transaction practices, including the 2% fee. The forms of the monthly billing statements would change with conspicuous wording that would include: "Foreign currency conversion rate is base rate plus 2%." The cardmember agreements would disclose in detail how conversion rates are determined and prominently disclose the 2% charge in bold type, and would limit American Express' selection of a base rate to one which does not exceed the highest official conversion rate published by a government agency or highest interbank conversion rate. In this way, Class Members would be alerted to the fee each time they make a purchase in foreign currency, and American Express could not simply select a base rate "based on" an interbank rate, as it had done in the past.

The proposed settlement class was preliminarily certified, solely for purposes of effectuating the amended settlement, as follows:

> All former or current American Express cardmembers or account holders with U.S. billing addresses who incurred a charge denominated in a foreign currency, and paid that charge in U.S. dollars, during the time period between March 28, 1997 and October 15, 2004, and who did not negotiate (or on whose behalf there was not negotiated) a foreign currency conversion methodology for their American Express account(s).

(Modified Order, p. 2 [D.E. 155] ). If the settlement were approved, all of the stayed actions against American Express would be resolved.

The *Paul* and *Ball* intervenors, however, continued to object. The *Paul* intervenors maintained that the proposed settlement did not appropriately address American Express' currency conversion practices in Turkey. The *Ball* intervenors opposed the settlement on the ground that it would impinge the claims presented in the California lawsuit, filed in August of 2004, in which the allegations centered on the practice of American Express "inflating foreign currency exchange charges on all purchases made by American Express cardholders abroad, contrary to the American Express Cardholder Agreement."[6] (*Ball Comp.* ¶ 1). This "spread claim" was later also adopted by the *Paul* intervenors.

---

**4.** Thus, if all fees are awarded, there will be $63,500,000.00 available for distribution to Class Members after the payment of fees and the initial charitable contribution of $500,000.00.

**5.** A reversion appears highly unlikely given the number of claims submitted.

**6.** Again, the cardmember agreement provides that American Express would exchange "at a rate set by [American Express] or [its agents] at a rate set by us based on an interbank, tourist, or (where required) official rate...." (*Joint Decl.* ¶¶ 43–44 [D.E. 271] ).

These intervenors thus vigorously opposed the proposed preliminary approval of the settlement because they maintained Plaintiffs and Class Counsel were agreeing to inadequate consideration for the release of their claims. Nevertheless, and following the vacatur of the initial preliminary approval of February 17, 2004 [D.E. 7], in October of 2004[7] the foregoing modified settlement was preliminarily approved. This settlement also included a modification based on the discovery regarding the Turkey rounding claims. Because transactions in Turkey were uniquely affected by rounding so that base exchange rates were increased by approximately 6.58% rather than 2%, the proposed allocation method was changed to allow class members who had used their cards in Turkey to claim an additional 4.5% of Turkish Lira transaction amounts from the settlement fund in addition to the 2%.

Because of the unresolved nature of the *Paul* and *Ball* objections, however, the parties and the intervenors were granted the ability to conduct discovery "as to matters that may bear upon the criteria that will be evaluated and addressed at the Final Fairness Hearing." (Modified Order Preliminarily Approving Class Action Settlement, p. 10 [D.E. 155]). Accordingly, between October of 2004 and the date of the final fairness hearing, on March 14, 2005, the intervenors obtained documents and took the depositions of several American Express representatives. Moreover, these intervenors also participated in a full-day mediation before former Federal Magistrate Judge Edward Infante on December 8, 2004. The mediation proved unsuccessful.

### D. The Final Fairness Hearing

The Fairness Hearing was held on March 14 and 15, 2005 for the purposes of ascertaining "whether the proposed settlement of the LiPuma Action on the terms and conditions provided for in the Amended Settlement is fair, adequate and reasonable as to the Settlement Class Members and should be approved by the Court; whether a Final Approval Order and Judgment as provided for in the Stipulation should be entered; and the amount of fees and expenses that should be awarded to Class Counsel, and of the incentive award to the Representative Plaintiff, as proposed in the Stipulation." (Modified Order, p. 4 [D.E. 155]). Class Members were given up to and including April 13, 2005 to submit claims.

In accordance with the Order granting preliminary approval, American Express began mailing notices to approximately 9 million Class Members on January 11, 2005. Notice was also published on January 11, 2005 in publications with circulations of over 9.5 million. American Express retained Rust Consulting, Inc. to administer the settlement, and paid $3,111,522.00 for mailing the Class notices, and estimated the cost to complete the processing of claim forms, exclusions, correspondence and other miscellaneous administration to be an additional $3,596.794.00. The estimated costs of implementing the negotiated modifications to cardmember billing statements is approximately $2,500,000.00.

As of April 25, 2005, there had been 827,444 filed claims, constituting approximately 9.4% of the Class. As of May 15, 2005, there had been 830,976 claims filed. (Class Plaintiffs' Notice of Filing [D.E. 374]). As of the date of the Final Fair-

---

**7.** An October 15, 2004 Order Preliminarily Approving Class Action Settlement [D.E. 153] was replaced by a Modified Order Preliminar-ily Approving Class Action Settlement [D.E. 155] entered on October 29, 2004.

ness Hearing, there had been 1,159 opt-outs and 41 objections.

For Class Members who submit timely and valid claims, settlement payments will be made as follows. For those whose accounts were opened after February 1, 1999, the payment will be 100% of the foreign transaction fee paid by the Class Members between February 1, 1999 and October 15, 2004, based on American Express' records. For those who made purchases in Turkish Lira between February 1, 1999 and January 31, 2004, an additional 4.58% may be claimed. For those whose accounts were opened before February 1, 1999, the payment will be the foreign transaction fee plus $15.00, since account data for that early time period is difficult to compile. For Class Members whose accounts were closed before February 1, 1999, the payment will be $15.00. If the aggregate amount claimed exceeds the $75 million, less the $500,000 charitable contribution and fees and costs, payment will be decreased on a pro rata basis.

The *Paul* and *Ball* intervenors raised a number of objections to the proposed settlement. The intervenors argued that the proposed settlement is not entitled to a presumption of fairness because the negotiating process disarmed Class Counsel and undermined their representation of the Class. They maintained that Class Counsel did not fully investigate the rate selection claims before they compromised those meritorious claims in the proposed settlement for inadequate compensation, and that the intervenors' claims do not share the identical factual predicate of the *LiPuma* and *ELF* claims and so cannot be released in the proposed settlement. Intervenors also objected that the proposed revisions to American Express' disclosures were ineffective, that the notice provided to the Class was defective, that the substance and amount of opposition to the settlement in light of the deficient notice weighed against approval, that the claims-made structure for settlement should be replaced by a "direct-credit" format, and that the settlement failed to account for currency-specific rate adjustments. In sum, the intervenors maintained that the settlement should not be approved because it is not fair, adequate and reasonable.

At the hearing, all intervenors and parties who appeared and wished to be heard from were given an opportunity to present their positions and arguments. In addition, the *Paul* and *Ball* intervenors presented evidence and testimony of witnesses. One of those witnesses, accountant Walter Bratic, opined that the amount of revenue or fees American Express charged its cardmembers with respect to the competitive rate adjustment and clearance revenues was approximately $422 million. In his Supplemental Declaration filed on March 11, 2005 [D.E. 322], Mr. Bratic reports:

6. In addition to a 2% fee on purchases made in foreign currencies, American Express generated at least two other forms of revenue on U.S. cardmembers' purchases in foreign currencies: (1) "competitive rate adjustment" revenues, in which American Express charged U.S. cardmembers an additional percentage fee on purchases made in certain currencies ... and (2) "clearance revenue", in which American Express charged U.S. cardmembers additional money by applying a less favorable exchange rate to the cardmembers' purchases than the actual exchange rates realized by American Express. [footnote omitted]

7. Based on my analyses, American Express has generated more than $422 million from competitive rate adjustment revenues and clearance revenues.... Mr. Morlen has estimated that the com-

petitive rate adjustment revenues alone totaled approximately $45 million....

((*Id.*, p. 3)[D.E. 322] ).

Columbia University Law Professor Samuel Issacharoff, whose declaration was filed on March 9, 2005 by the intervenors, also testified at the hearing, and did so consistent with his declaration. Professor Issacharoff has testified before the Advisory Committed on the Rules of Practice and Procedure of the Judicial Conference of the United States and the Third Circuit Task Force on the Selection of Class Counsel on matters pertaining to the selection of and compensation of class counsel. He has also testified as an expert on many aspects of complex litigation. Professor Issacharoff was retained by the *Paul* and *Ball* intervenors to opine on the proposed final settlement, in particular, the scope of the release afforded in the litigation and the negotiations posture of the parties in arriving at the settlement.

According to Professor Issacharoff's declaration,

> 7.... The most striking and disturbing feature of the present proposed settlement is that the release reaches claims that were never pleaded in the underlying action and were negotiated away without any effort to assess their value. The underlying actions, ... alleged only that the American Express defendants added a one to two percent surcharge to all foreign transactions.... [I]t appears class counsel did not adequately investigate and value the "rate selection" claims.

> \*   \*   \*   \*   \*   \*

> 8.... [C]lass counsel were entering a settlement to give up claims that not only were they unaware of, and did not plead, but that they apparently were in no position to value....

> \*   \*   \*   \*   \*   \*

> 14. The proposed settlement presents a release that, in my opinion, cannot be reconciled with the underlying cases [previously cited and discussed]. The present action, the proposed settlement vehicle, was originally filed in Florida state court on behalf of a class of only Florida citizens, and raising claims pertaining to only one type of transaction: the disputed 2 percent surcharge on foreign transactions charged on American Express cards. There were no claims brought on behalf of citizens of any other state; there were no allegations about any impropriety on foreign transactions independent of the 2 percent surcharge; and there were no claims premised on anything other that Florida state law, most centrally FDUPTA, the Florida state consumer protection law.

> 15.... [T]he claims in the Florida state action did not cover the practices generally termed "rate selection" claims. Clearly, Florida counsel were free to prosecute or not prosecute any claims they wished. The problem arises when they try to settle claims that were not part of their case, that did not fall within the scope of their discovery, and that they did not attempt to independently value.... American Express has formally admitted that it did not quantify for class counsel the revenues it earned through its rate selection practices, and that it did not provide to class counsel documents or information that would have permitted them to value the rate selection claims....

> \*   \*   \*   \*   \*   \*

> 18.... Only after settlement negotiations were concluded was the Florida complaint amended to expand its scope nationwide, to expand the complained of conduct to reach beyond the two percent surcharge, and to add a thinly supported

federal Truth in Lending Act ("TILA") claim as a predicate for removal to federal court. . . .

\* \* \* \* \* \*

20. . . . [T]he release offered in the proposed settlement is far beyond what either set of counsel had indicated an interest in prosecuting, binds people that [sic] would never have been bound by the litigation of the Florida and California state law claims, and covers conduct which most likely never would have been subsumed by any res judicata effect of the trial or settlement of the underlying state class action cases.

\* \* \* \* \* \*

22. Further, there are serious allegations that the negotiations themselves were conducted under the threat of a "reverse auction," . . . .

23. The concept of the reverse auction is quite well developed in the academic literature. The concern is that in overlapping class actions a defendant may wish to buy peace by cutting a deal with the weakest potential class counsel, thereby offering a windfall to lawyers who had no leverage in the case, other than the willingness to settle cheap. . . .

\* \* \* \* \* \*

25. . . . American Express did attempt to play off the Florida versus the California state court classes to achieve the broadest settlement at the cheapest price. . . .

\* \* \* \* \* \*

31. Consistent with the foregoing, I believe that this Court should not approve the settlement as tendered. The release of all claims unconnected to the two percent surcharge and the conduct of whipsawed negotiations present this Court with strong evidence of a rushed settlement that does not provide adequate representation for the proposed settlement class.

(Declaration of Professor Samuel Issacharoff in Opposition to Final Settlement Approval ("*Issacharoff Decl.*"), pp. 3–12 [D.E. 316] ).

Professor Issacharoff also acknowledged, however, that:

9. . . . To the extent that additional released claims are transactionally related to the underlying conduct and are merely alternative causes of action that could have been brought against the challenged conduct, the defendants' demands for finality and closure appear appropriate and have given courts little pause. To a large extent, a release that reaches all transactionally related claims is simply building into the express terms of the settlement those claims that would likely be barred anyway by the operation of res judicata. Since claim preclusion would apply to all claims that were raised or could have been raised arising from the same transaction or occurrence, the class action release simply builds in additional protection against relitigation. Thus a release is most proper to the extent that it formalizes what parties and reviewing courts would likely conclude to have been all the transactionally related claims covered by the lawsuit.

10. A release becomes increasingly problematic to the extent that it moves beyond what was actually litigated or what was at stake in the original litigation, and begins to cover unrelated matters. When the release expands beyond transactionally-related claims, there are serious problems presented. . . . Plaintiffs' counsel negotiating the settlement of claims never raised in the complaint and not transactionally related to claims in the complaint have neither the incentive nor the capacity to negotiate very

strenuously over the terms of the release of such claims. Such plaintiffs' counsel have no leverage and no incentive to hold out since, by definition, claims not raised are not capable of being litigated.

(*Id.*, pp. 4–5 [D.E. 316] ).

At the hearing, Walter Bratic was questioned concerning whether the two-percent surcharge and the rate selection claims were transactionally related as follows:

Q. Two things happen. A rate adjustment and a fee is attached. Is that correct?

A. For one transaction, yes.

Q. The same—

A. For the time period in which there was a competitive rate adjustment applied.

Q. Exactly.

\* \* \* \* \* \*

Q. During the time, though, they had the competitive rate adjustment on certain currencies if there is no purchase, then there would be no rate adjustment. Correct?

A. Well, that's correct.

Q. And, further, if there is no purchase, there wouldn't be a 2 percent fee added, would there, sir?

A. That's true.

(Trans. of Fairness Hearing, March 14, 2005, pp. 80–81).

*E. Post–Hearing Developments*

After the hearing, the parties and intervenors filed several motions. These were addressed in an order entered September 9, 2005, which in part granted a motion to strike statements made during the parties' December 8, 2004 mediation, unless a waiver of the privilege had occurred. [D.E. 397]. To the extent statements made at mediation are contained in this Order, then, it is because the undersigned

has found the privilege to have been so waived.

The September 9, 2005 order also granted a motion by intervenors to take judicial notice of an April 28, 2005 order in *Hoffman v. American Express,* Case No.2001–022881 in Alameda County, California. In that order, American Express Travel Related Services' motion to confirm the termination of the parties' settlement and return to the status quo ante was granted and the settlement vacated. Of particular relevance to this proceeding, the court in *Hoffman* found that counsel for American Express, Mr. Pearson, had given misleading information in several respects in connection with obtaining approval of the proposed settlement there.

On September 27, 2005, a protective order was entered at the request of the intervenors and American Express, but objected to by LiPuma, that gave the intervenors and American Express the ability to conduct a statistical sampling and evaluation of the Class Members' claims submitted, and that required such information to remain confidential. [D.E. 405]. Following the statistical sampling, intervenors and American Express remained unable to reach a resolution of the intervenors' objections to the proposed settlement. [D.E. 409]. Therefore, on November 10, 2005, Defendants requested a resolution of final approval of the proposed settlement. [*Id.*].

## II. ANALYSIS OF THE FAIRNESS, ADEQUACY AND REASONABLENESS OF THE PROPOSED SETTLEMENT, AND THE METHODS BY WHICH IT WAS NEGOTIATED

This action was settled prior to certification. A class may be certified "solely for purposes of settlement where a settlement is reached before a litigated determination

of the class certification issue." *Woodward v. NOR–AM Chem. Co.*, 1996 WL 1063670 *14 (S.D.Ala.1996), citing *In re Beef Indus. Antitrust Litig.*, 607 F.2d 167, 173–78 (5th Cir.1979), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1981)[8]. In *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), the Supreme Court held that because a settlement class action obviates a trial, the district judge deciding whether to certify a settlement class action "need not inquire whether the case, if tried, would present intractable management problems," under Rule 23(b)(3)(D). However, "the settlement context demands undiluted, even heightened attention to unwarranted or overbroad class definitions." *Id.*

Regardless of whether a class is certified for settlement or for trial, the Court must find these prerequisites are met: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). The proposed class must also meet the requirements of one of the three class types found in Rule 23(b). In this case, the parties sought certification under Rule 23(b)(3), on the basis that "the questions of law or fact common to the members of the class predominate" over individual issues of law or fact and that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Because the undersigned found that the Rule 23(a) and (b) standards were satisfied, the set-

tlement class was preliminarily certified, and notice to putative members of the proposed class was required in the Modified Order Preliminarily Approving Class Action [D.E. 155].

Under Rule 23(e), Fed.R.Civ.P., "[a] class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs." While the Rule does not provide standards for approval, those standards have been articulated time and time again in reported decisions. First, there exists "an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex." *Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D.Fla.2002); *Access Now, Inc. v. Claire's Stores, Inc.*, 2002 WL 1162422 *4 (S.D.Fla.2002)(both citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir.1977)). A proposed class action settlement should be approved as long as it is "fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir.1984). Thus, in reviewing a proposed settlement, as here, the Court must take into account "the clear policy in favor of encouraging settlements, ... particularly in an area where voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." *Patterson v. Newspaper & Mail Deliverers' Union*, 514 F.2d 767, 771 (2d Cir.1975) (citations omitted).

■ Next, the relevant factors the Court should consider in determining whether a settlement is fair, adequate, and

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)(*en banc*), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

reasonable have been enumerated as follows:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. In assessing these factors, the Court "should be hesitant to substitute ... her own judgment for that of counsel." *In re Smith*, 926 F.2d 1027, 1028 (11th Cir.1991). Furthermore,

> [T]he judge must guard against the temptation to become an advocate—either in favor of the settlement because of a desire to conclude the litigation, or against the settlement because of the responsibility to protect the rights of those not parties to the settlement. In reviewing the settlement the judge is called upon to be impartial and neutral, favoring neither the proponents of the settlement nor those who are opposed or absent.

*Id.*, quoting *Moore's Federal Practice, Manual for Complex Lit.2d* § 23.14 at 160 (1986).

Thus, the issues presented that bear upon whether or not to grant final approval here are: a) whether the settlement was procured by collusion among the parties or was the result of arms-length and informed bargaining; and b) whether the proposed final settlement is fair, adequate and reasonable, applying the six *Bennett* factors.

## A. The Settlement is the Product of Informed, Arms–Length Negotiations

■ Intervenors maintain that Class Counsel did not include valuable [9] rate selection claims in the original pleading, and thereafter did not value or pursue information about those claims before they agreed to amend the pleading to assert them, and later compromised and received no value for them at the suggestion of American Express. Intervenors urge that the proposed settlement not be approved because the release obtained does not correspond to the claims pleaded or to the information given in the notice of the proposed settlement. Furthermore, it is suggested that the settlement is the product of a "reverse auction" because American Express conducted negotiations with California counsel and LiPuma counsel simultaneously. Intervenors insist that the negotiating process disarmed Class Counsel and undermined their representation of the Class and that the negotiation process was irregular and not truly conducted at arms-length.

Undoubtedly, but for the suggestion made by American Express' counsel, the Complaint would not have been amended when it was to add the spread claim, which the proposed settlement disposes of. Also unmistakable is the fact that the original Complaint was predicated solely upon the allegedly deceptive foreign currency conversion practice surrounding the addition

---

9. Intervenors argue that the [Rate Selection] Claims are legally stronger than the 2% transaction fee claim: while American Express actually discloses the 2% fee in its Cardmember Agreements, it failed entirely to disclose the "competitive rate adjustments" and failed to disclose that American Express would system-

atically charge their customers for the highest interbank rate, while securing more favorable rates for itself, both of which added to the costs of card members' foreign currency transactions. (Intervenors' Response to Submissions in Support of Final Approval of Settlement, p. 21 [D.E. 317] ).

of a 1–2% rate adjustment, which was not revealed in cardmembers' monthly statements. This fact is reinforced by American Express' insistence that Class Counsel amend the Complaint to add the spread claim.

However, and notwithstanding the seeming irregularity in the process utilized here, there is no evidence of fraud or collusion among Class Counsel and Defendants' counsel. When settlement discussions were broached with Class Counsel, this action was already pending and discovery had already been served. The *Bildstein* action had been pending and the court in that case had encouraged the parties to pursue settlement before it would rule on the question of the enforceability of the arbitration clause. The attorneys in the *LiPuma* and *Bildstein* actions had extensive negotiations with counsel for American Express. It was after settlement discussions in the *ELF* action terminated that the settlement discussions here began.

American Express' counsel did not have lawyers in the cases bid against one another, and counsel for *ELF* were successful in enhancing the proposed settlement here. While it may have been less than desirable for Defendants' counsel to insist the Complaint be amended to clearly articulate a spread claim and a nationwide class, American Express sought to negotiate a global peace, and ensuring that all possible claims arising from the foreign currency conversion methodology be included was a critical component of any proposed settlement. As at least one court has recognized, defendants may properly "insist upon amendments to the pleadings broadening the scope of the action prior to settlement, in an effort to 'cover everything' and insure that the settlement will in fact result in an end to litigation." *Trotsky v.*

*Los Angeles Fed. Sav. and Loan Assoc.,* 48 Cal.App.3d 134, 147–48, 121 Cal.Rptr. 637 (1975) (citations omitted). Thus, the procedural irregularity here does not necessarily lead to a conclusion that there was collusion among the parties. *Cf. Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 280–81 (7th Cir.2002)(objectors maintained settlement was product of a reverse auction where negotiations occurred before the filing of class action suits and plaintiffs' counsel "later 'bought' a client from another lawyer, to whom she promised a $100,000 referral fee.").

Intervenors' objection that Class Counsel did not value the spread claim before negotiating the settlement is well-placed. That it was not valued, however, does not mean that Class Counsel did not have sufficient information from which to negotiate a fair settlement. There was minimal discovery about this claim, added to the Amended Complaint at Defendants' insistence, because Class Counsel felt it was a relatively weak claim, *see, discussion infra.* at 1319–21; because some members of Class Counsel were intimately familiar with credit card practices regarding the processing of foreign charges, including the practices of American Express, as a result of their participation in the *Schwartz* case; and because, like American Express' counsel, Class Counsel were negotiating a global settlement and trying to do so before a possible negative ruling on the enforceability of the arbitration provision.[10] Given Class Counsels' other sources of information, and knowledge about the relative strengths and weaknesses of the spread claim, this objection should not bar approval of the settlement. *See, e.g., Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir.1977)(approving settlement over objection that not enough discovery

---

**10.** American Express had already succeeded in compelling arbitration in *Wick.*

was conducted because plaintiffs were adequately informed despite fact that "very little formal discovery was conducted and that there is no voluminous record in the case"); *In re Jiffy Lube Securities Litig.*, 927 F.2d 155 (4th Cir.1991)(plaintiffs were sufficiently informed about the strength of the case as a result of evidence obtained through informal discovery); *Bowling v. Pfizer*, 143 F.R.D. 141, 161 (S.D.Ohio 1992)(in rejecting objection that not enough discovery was done before approval of settlement, court observed: "We can imagine an inadequate settlement with much discovery done; similarly, we can envision an outstanding settlement with little discovery done.").

The principal objection to the process employed by Class Counsel and counsel for American Express is centered around Professor Issacharoff's concern that the proposed settlement presents a release that disposes of rate selection claims that were not a part of the case and that Class Counsel were in no position to bargain away those claims, the value of which was not properly determined. However, as even Professor Issacharoff noted, "[to] the extent that additional released claims are transactionally related to the underlying conduct and are merely alternative causes of action that could have been brought against the challenged conduct, the defendants' demands for finality and closure appear appropriate and have given courts little pause." (*Issacharoff* Decl., pp. 4–5 [D.E. 316] ). Thus, the question presented is whether the 1–2% surcharge that American Express added to all foreign currency conversion exchanges is transactionally related to its addition of a competitive rate adjustment, neither component of the foreign currency conversion process which was disclosed to cardmembers in monthly statements. Certainly, intervenors' expert, Walter Bratic, admitted the two steps of the process were transactionally related.

In *Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir.2005), the Second Circuit had occasion to consider objections to a proposed settlement similar to those presented here. Appellants in *Wal–Mart* argued that the damages sought by the settlement differed from the damages that could be sought based upon appellants' claims and legal theories. *Id.* at 109–10. In rejecting the objections, the court noted the "well established" law that "class actions may include claims not presented and even those which could not have been presented as long as the released conduct arises out of the 'identical factual predicate' as the settled conduct." *Id.* at 106. The court went on to state that "class action settlements have in the past released claims against non-parties where, as here, the claims against the non-party being released were based on the same underlying factual predicate as the claims asserted against the parties to the action being settled." *Id.* at 109 (citation omitted).

Similarly, here, the same underlying factual predicate supports the foreign currency conversion practices of American Express. American Express converted foreign transactions to U.S. Dollars by unilaterally selecting a currency exchange rate from either an interbank, tourist or official rate, and making an adjustment of up to 2%. It is alleged that the failure to disclose this practice was deceptive. While certainly the initial pleading focused solely on the rate adjustment, it is not unreasonable for American Express to have requested that the pleading be amended to add express language that would resolve any future claims concerning the "spread claim" since the two formed part of one continuous process of foreign currency conversion.

In contrast, the cases intervenors rely upon, *National Super Spuds, Inc. v. New*

*York Mercantile Exchange,* 660 F.2d 9 (2d Cir.1981), and *In re Auction Houses Antitrust Litig.,* 42 Fed.Appx. 511 (2d Cir. 2002),[11] present instances where the settlements included the release of claims that were not related to the claims litigated. In *National Super Spuds,* the proposed settlement was not approved because it released claims arising from purchases of unliquidated futures contracts, although the only claims presented and noticed were of plaintiffs who had purchased liquidated futures contracts. In *In re Auction Houses,* auction patrons alleged only that auction houses conspired to fix prices on domestic auctions. In rejecting a settlement that also released class members' rights to bring claims related to foreign auctions, the court noted that in expanding the scope of the release, the settlement prejudiced the holders of the claims which had been presented. 42 Fed.Appx. at 519.

Here, the "claimants" are one and the same. Any party aggrieved by American Express' application of a rate adjustment and failure to disclose the adjustment in the monthly statements, would also be aggrieved by American Express selecting the most favorable rate but not passing that along to the cardmember, or revealing it. As American Express observed, "each American Express cardmember who incurred a charge denominated in foreign currency and paid that charge in U.S. dollars will receive consideration for the release of their claims." (Brief of Defendants in Support of Final Approval, p. 43

[D.E. 265] ). The harms are transactionally related, and moreover, were explained and included in the Amended Complaint and in the notice [12] to the Class.

The judgment of the experienced Class Counsel in this case was to include the rate selection practices of American Express within the scope of the claims released by the global settlement achieved. They could have disagreed with American Express' suggestion to amend the pleading, and to the ultimate terms negotiated with the assistance of retired federal judges. They chose not to, but not because of fraud or collusion. As noted by the Eighth Circuit,

> The release of [a particular] category of claims was one of a series of benefits conferred on the defendant by the class as part of the settlement. On the other side, defendant conferred benefits on the plaintiff class, including a monetary settlement, from which the plaintiff in this [related] case has benefitted, and a ... procedure that could produce additional relief. No part of the consideration on either side is keyed to any specific part of the consideration of the other. It was the judgment of the class representative that [a particular category of claims], known and unknown, was a proper thing to give up to obtain the benefits offered....

*In re General Am. Life Ins. Co. Sales Practices Litig.,* 357 F.3d 800, 805 (8th Cir.2004). Here, the benefits conferred

---

**11.** Notwithstanding that *In re Auction Houses* is not to be cited as precedential authority, it was cited here by intervenors in their Objections to Final Approval of Settlement. [D.E. 225].

**12.** Given the undersigned's conclusion that the rate selection and spread claims are transactionally related, the failure of the Class notice to reveal the settlement would be disposing of other claims, such as those raised in

the *Ball* and *Paul* actions, does not render it defective. *See, e.g., In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 224 (5th Cir.1981)(notice of pending certified class action not required despite alleged superiority of relief available in the alternative action); *Wal–Mart,* 396 F.3d at 114 (notice sufficient even though it did not advise class members that claims in other pending actions would be released).

upon the Class are substantial, and are the result of informed, arms-length negotiations by experienced Class Counsel. *Cf. Reynolds v. Beneficial Bank,* 288 F.3d 277 (7th Cir.2002)(final approval reversed where lawyers who had effectively no clients and no cases on file offered a nationwide settlement in exchange for handsome fees and a paltry return to the class).

### B. The Settlement is Fair, Adequate and Reasonable

#### (1) Likelihood of Success at Trial

■ Turning then to application of the *Bennett* factors, the first consideration is Plaintiffs' likelihood of success at trial. *Bennett,* 737 F.2d at 986. The likelihood of success on the merits is weighed against the amount and form of relief contained in the settlement. Here, the claims asserted are weak, and the defenses raised present a significant hurdle to any potential recovery in any event.

#### a. Weak Claims

The essence of the claims presented by LiPuma is that American Express does not adequately disclose its foreign currency conversion methodology. As to the 1–2% rate adjustment, however, this may not be the case. In contrast to the complete absence of disclosure of a 1% rate adjustment by Visa and MasterCard raised in the *Schwartz* decision, here American Express clearly discloses in the cardmember agreements that "[i]f you initiate a transaction in a foreign currency, it will be converted into U.S. dollars on the date it is processed by us or our agents at a rate set by us based on an interbank, tourist or (where required by law) official rate, increased in each instance by [1–2%]." Admittedly, this is not repeated in the monthly statements.

American Express cardmembers have indicated they knew full well the rate ad-

justment would be applied. *See, e.g., Hall Decl.,* Ex. E [D.E. 266]("I consider that American Express has clearly disclosed its conversion practice in its Agreements. . . ."); Ex. J. ("It was clear and obvious to the most casual observer that there was an appropriate fee attached to the conversion of foreign funds."). Intervenors' counsel have also conceded the rate adjustment is adequately disclosed. (*Pearson Decl.,* ¶ 19, Ex. D, at 26:15–16 [D.E. 327] (Mr. Caddell: "I knew they added 2 percent because I read my card member agreement); 48:1–4 (Mr. Stellings: like Mr. Caddell, I knew that I was paying 2 percent for my foreign currency transactions.")). Thus, if it is determined that the rate adjustment is adequately disclosed, a Truth in Lending Act (15 U.S.C. § 1601) cause of action based on an allegedly deceptive practice by American Express is necessarily a weak claim.

As to the failure to disclose to cardmembers the interbank rates American Express used, intervenors have cited no authority to support a finding that a duty to disclose this information to cardmembers exists. In contrast, the decision of *In re Mexico Money Transfer Litigation,* 267 F.3d 743 (7th Cir.2001) supports the opposite conclusion, as urged by American Express. In *In re Mexico,* the plaintiffs claimed that two wire-transfer companies fraudulently represented that patrons could wire $300 to Mexico for only $15 since the companies actually collected the difference between the retail currency exchange rate quoted to customers and the wholesale interbank rate at which the companies bought pesos on the foreign currency market. Plaintiffs maintained that the defendant-companies should have disclosed the difference in foreign exchange rates, the foreign currency exchange spread, or at least the price at which the companies bought the pesos. *Id.,* at 745.

In finding that these claims had only "nuisance value," and that the settlement reached was "more in the nature of the PR gesture, coupled with a goal of freedom from a drumbeat of litigation," *id.*, at 748–49, the court in *In re Mexico* made these observations:

> Money is just a commodity in an international market. *Dunn v. CFTC*, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997). Pesos are for sale—at one price for those who buy in bulk (parcels at $5 million or more) and at another, higher price for those who buy at retail and must compensate the middlemen for the expense of holding an inventory, providing retail outlets, keeping records, ensuring that the recipient is the one designated by the sender, and so on. Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods. The customer of a bank's foreign-exchange section (or an airport's kiosk) is quoted a retail rate, not a wholesale rate, and must turn to the newspapers or the Internet to determine how much the bank has marked up its Swiss Francs or Indian Rupees.... Money-Gram and Western Union revealed truly, and separately, the exchange rate they offered (the price per peso) and the rate for the wire transfer to Mexico. Each customer was told how many dollars in the United States would result in how many pesos delivered in Mexico. Nothing in this transaction smacks of fraud, so the settlement cannot be attacked as too low.

*Id.* at 749. *See also Sanchez v. Gromex, Inc.*, 2004 Cal.App. Unpub. Lexis 11053 (Dec. 2, 2004)(affirming summary judgment for defendant where fee for currency was disclosed but the foreign exchange spread was not); *Bildstein v. MasterCard Int'l Inc.*, 329 F Supp.2d 410 (S.D.N.Y.2004)(dismissing case of failure to disclose foreign currency conversion methodology for failure to state a claim); *McCann v. Lucky Money, Inc.*, 129 Cal. App.4th 1382, 29 Cal.Rptr.3d 437 (2005)(rejecting claims under California consumer protection statutes that defendant must disclose rate at which it purchases foreign currency or profit on foreign currency exchange spread). Such observations apply with equal force here, and could be effectively utilized by American Express in defense of the claims presented.

Similarly, the claim that American Express' currency conversion practices are unconscionable is weak. Unconscionability includes a procedural element, relating to the manner in which a contract was entered and the parties' bargaining power and ability to understand the contract terms. *Stewart Agency v. Robinson*, 855 So.2d 726, 727 (Fla. 4th DCA 2003)(unconscionability of arbitration clause under Florida law). Unconscionability also includes a substantive component, focusing on the actual agreement and whether the terms are unreasonable and unfair. *Id.*

Here, the foreign currency conversion practices are disclosed in the cardmember agreements, and cardmembers have an opportunity to understand the information, and several have presented statements indicating such comprehension. Cardmembers have alternatives to using the card overseas, such as the use of traveler's checks or cash. The rates offered by American Express to its cardmembers are superior to alternative sources of currency conversion, and thus are not unreasonable or unfair. American Express incurs risks and costs associated with foreign currency exchange transactions, and substantial costs with maintaining foreign travel offices. Because of the complexity of for-

eign currency exchange operations, it is not unconscionable for American Express to make a profit from these transactions.

### b. Strong Defenses

One of the fundamental stumbling blocks to this case is the existence of the cardmember arbitration clause. As stated, the arbitration provision applies to "any claim, dispute or controversy between you [cardmember] and us [American Express] arising from or relating to ... the Cardmember Agreement ... [and] includes claims of every kind and nature, including but not limited to ... claims based upon contract, tort, fraud and other intentional torts, statutes, regulations, common law and equity, and provides that the term "Claim" is to be given the broadest possible meaning." (*Clements Decl.*, Ex. D [D.E. 266] ). In addition to providing that any Claim shall be resolved by arbitration upon the election of the cardmember or by American Express, the arbitration provision unambiguously states: "There shall be no right or authority for any Claims to be arbitrated on a class action basis or on bases involving Claims brought in a purported representative capacity on behalf of the general public, other Cardmembers or other persons similarly situated; provided however, that the claimant's individual Claim would be subject to this Arbitration Provision. (*Id.*).

The pertinent cardmember agreements provide that they are variously governed by either the laws of the State of Utah or of New York, and applicable federal law. Admittedly some arbitration agreements limiting class action rights in similar settings have not been enforced. *See, e.g., Discover Bank v. Sup. Court (Boehr)*, 113 P.3d 1100, 30 Cal.Rptr.3d 76 (2005); *Powertel v. Bexley*, 743 So.2d 570, 576 (Fla. 1st DCA 1999); *State v. Berger*, 211 W.Va. 549, 567 S.E.2d 265, 278 (2002); *Leonard*

*v. Terminix Intern. Co. L.P.*, 854 So.2d 529, 538 (Ala.2002); all cited by intervenors in their Notice of Submission of Case Authority. [D.E. 391]. However, the New York courts have consistently upheld arbitration agreements in credit card and other consumer agreements. *See, e.g., Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 786 N.Y.S.2d 478 (N.Y.A.D. 1 Dept.2004); *Johnson v. Chase Manhattan Bank USA, N.A.*, 2 Misc.3d 1003, 784 N.Y.S.2d 921, 2004 WL 413213 *4–8 (2004); *Ranieri v.Bell Atlantic Mobile, Inc.*, 304 A.D.2d 353, 759 N.Y.S.2d 448 (1st Dep't 2003); *Whalen v. American Express*, 01–602754 (N.Y.Sup.2002). Courts in Utah similarly favor agreements to arbitrate. *See, e.g., Central Fla. Investments, Inc. v. Parkwest Assocs.*, 40 P.3d 599 (Utah 2002); *Chandler v. Blue Cross Blue Shield*, 833 P.2d 356 (Utah 1992).

Federal courts have also not hesitated to enforce arbitration agreements that precluded class action relief. *See, e.g., Randolph v. Green Tree Fin. Corp.*, 244 F.3d 814, 819 (11th Cir.2001); *Jenkins v. First American Cash Advance of Georgia, LLC, et al.*, 400 F.3d 868 (11th Cir.2005); *In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385 (S.D.N.Y.2003). As the undersigned has previously acknowledged, the Federal Arbitration Act ("FAA") establishes a general federal policy favoring arbitration. *Sims v. Clarendon Nat'l Ins. Co.*, 336 F.Supp.2d 1311, 1316 (S.D.Fla. 2004). Section 2 of the FAA provides as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be

valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract. 9 U.S.C. § 2. "Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, a number of federal courts have enforced arbitration provisions in credit card agreements under the FAA. *See, e.g., In re Currency Conversion Fee Litig.*, 265 F.Supp.2d 385, 400–416 (S.D.N.Y.2003); *Vigil v. Sears Nat'l Bank*, 205 F.Supp.2d 566, 568 (E.D.La.2002); *Hale v. First USA Bank, N.A.*, 2001 WL 687371 *7–8 (S.D.N.Y.2001); *Bank One, N.A. v. Coates*, 125 F.Supp.2d 819, 831–33 (S.D.Miss.2001), aff'd, 34 Fed.Appx. 964 (5th Cir.2002).

If this case is not settled, American Express fully intends to interpose as a defense to this and other stayed litigation the enforceability of the contractual arbitration provision. It did so successfully in *Whalen v. American Express*, 01–602754 (N.Y.Sup.2002), and *Wick v. American Express*, Circuit Court of Cook County, Illinois, Case No. 03CH07811 (May 2, 2003). In light of the cited authority, American Express' arbitration defense is a solid one, giving further support to the proposed compromise.

In the absence of settlement, Plaintiffs are left with a claim that is predicated on (1) the failure to disclose a rate adjustment which is disclosed in the cardmember agreement, (2) the failure to disclose that American Express makes a profit in its selection of an interbank rate, and (3) a contract that specifically precludes class action recovery and requires arbitration. Even assuming a favorable outcome as to liability, a very real possibility exists that the trier of fact could find that there were no damages to cardholders because the cardholders could not obtain similar services at lower prices than given by American Express. Moreover, any resolution favorable to Plaintiffs here would certainly be followed by appellate proceedings, delaying class recovery. All of these uncertainties in outcome strongly favor approval of a negotiated settlement. *See, e.g., San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 460 (W.D.Tex.1999)("the substantial risk to each side as to the ultimate outcome strongly favors Settlement.").

(2–3) *Range of Possible Recovery and The Point on or Below the Range of Recovery at Which a Settlement is Fair*

The next two *Bennett* factors are the range of possible recovery and the point on or below the range at which a settlement is fair, adequate and reasonable. These two factors "are easily combined." *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 541 (S.D.Fla.1988). Not surprisingly, the range of possible recovery "spans from a finding of non-liability through varying levels of injunctive relief." *Assoc. for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 468 (S.D.Fla.2002). Monetary relief is difficult to quantify. According to the intervenors, and disputed by proponents of the settlement, the spread claims range from $583 million to a floor of $377 million; the competitive rate adjustment claims approximate $45 million, and the two-percent claims approximate $850 million. (*See* Intervenors' Summary of Issues Raised by Settlement Proponents' Final Approval Presentations).

In considering the question of a possible recovery, the focus is on the possible recovery at trial. *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th

Cir.1981). The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality. *See Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 106–07 (2d Cir.2005). Moreover, the existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable. *See, e.g., Bennett,* 737 F.2d at 986; *Behrens,* 118 F.R.D. at 542 ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.").

Here, the proposed settlement offers significant benefits to the Class. American Express has agreed to pay $75 million plus over $7 million in notice and administrative expenses. It has agreed to make changes to its foreign currency exchange practices, at internal expense, and make disclosure changes that address not only the 2% but also the selection of conversion rates, which will cost American Express approximately $2.5 million. American Express agreed not to increase the amount of the foreign currency rate adjustment between the date of preliminary approval and final approval. As a result, as of March 21, 2005, American Express had foregone approximately $35 million in additional revenue since the date of preliminary approval given that other card issuers had raised their foreign currency rate adjustments up to 3%. Thus, in total, American Express committed approximately $120 million to benefit the Class in exchange for the release of all claims arising out of the foreign conversion practices it used during the operative time period.

Intervenors' references to American Express' "revenue" should not be confused with "possible recovery" by the Class. No law or contract has been cited that prohibits the making of profit on the buying or selling of currency. No law or contract has been cited that would obligate American Express to offer the lowest interest rates it can obtain to its cardmembers. Where a claim has little to no merit, there is likely to be little to no recovery.

**(4)** *Complexity, Expense and Duration of Litigation*

The next factor to consider is the complexity and expense of litigating this case. *Bennett,* 737 F.2d at 986. "The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, '[i]t has been held proper to take the bird in the hand instead of a prospective flock in the bush.'" *In re Shell Oil Refinery,* 155 F.R.D. 552, 560 (E.D.La. 1993).

If this case were tried, significant trial expenses consisting of the payment of expert witnesses and technical consultants would be incurred. Experts in the fields of marketing, accounting, foreign currency exchange, economics and the credit card industry are contemplated as necessary. Witnesses are located all across the United States and abroad. Any trial would be of long duration given the issues and complexities of the claims. The case would not likely conclude following a trial, but would continue with appellate proceedings. By way of example, the *Schwartz* case, where a judgment was entered against Visa and Mastercard for concealment of a similar fee, is well into its sixth year of litigation.

"Complex litigation ... 'can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive.'" *Woodward v. NOR–AM Chem. Co.,* 1996 WL 1063670 *21 (S.D.Ala.1996)(quoting *In re U.S. Oil & Gas Litig.,* 967 F.2d 489, 493 (11th

Cir.1992)). Thus, "[s]ettlement will alleviate the need for judicial exploration of these complex subjects, reduce litigation cost, and eliminate the significant risk that individual claimants might recover nothing." *Id.* With the uncertainties inherent in pursuing a trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a resolution by way of settlement are apparent.

### (5) *Substance and Amount of Opposition to the Settlement*

In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor. *Wal–Mart Stores,* 396 F.3d 96, 117–118. Thus, a low percentage of objections points to the reasonableness of a proposed settlement and supports its approval. *Bennett,* 737 F.2d at 986. Conversely, a high percentage of objections signals that a proposed settlement is not fair and reasonable.

Here, as of May 15, 2005, there had been 830,976 claims filed. As of the date of the Final Fairness Hearing, there had been 1,159 opt-outs and 41 objections in response to the 8,822,803 notices mailed. Forty-one objections [13] constitutes an infinitesimal number (.00050%) when compared to the millions of potential class members. Over half of the objections offer statements that support American Express and its foreign currency conversion practices, and assert that the lawsuit lacks merit. (*Hall Decl.,* ¶ 2 [D.E. 266] ). The small number of opt-outs and objections, given the large number of claims filed, militates in favor of approval. *See, e.g., In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 355 (E.D.N.Y.2000)(approving settlement

based on small number of opt outs and objections in light of the "huge number of potential Class members and massive nationwide notice"); *Taifa v. Bayh,* 846 F.Supp. 723, 728 (N.D.Ind.1994)(approving class settlement, noting that objectors represent "little more than 10 percent" of the class).

### (6) *The Stage of the Proceedings at Which Settlement was Achieved*

The stage of the proceedings at which a settlement is achieved is evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation. *See Behrens,* 118 F.R.D. at 544. Certainly, courts favor early settlement. *See In re Vitamins Antitrust Litig.,* 2000 WL 1737867 *3 (D.D.C.2000), quoting *In re M.D.C. Holdings Securities Litig.,* 1990 WL 454747 *7 (S.D.Cal.1990)(" 'Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done.' "). Furthermore, vast formal discovery need not be taken:

> We have often seen cases which were "over discovered." In addition to wasting the time of this Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party. Discovery in its most efficient utilization should be totally extra-judicial.... Being an extra judicial process, informality in the discovery of information is desired.

*Cotton,* 559 F.2d at 1332.

Here, as already described, the proposed settlement was achieved early in the litigation, but not so early that Class Coun-

---

**13.** A number of the Class members are large, sophisticated corporations that have substantial claims. Only two major corporations, Lubrizol and Bridgestone/Firestone, objected, and their objections were directed to the administrative process for corporations.

sel did not have sufficient information to negotiate with. Class Counsel had familiarity with the practices that form the basis for the rate selection claims made in the *Schwartz* litigation. Information obtained from other cases may be used to assist in evaluating the merits of a proposed settlement of a different case. *See, e.g., San Antonio Hispanic Police Officers' Org., Inc. v. City of San Antonio*, 188 F.R.D. 433, 459 (W.D.Tex.1999)("a court may consider information available to the parties which was developed in prior or related proceedings.").

Even the intervenors acknowledge in the Erratum to Intervenors' Objections to Final Approval of Settlement [D.E. 262], that LiPuma's counsel had a certain amount of information prior to the settlement-in-principle being reached:

> Substantive and meaningful fact-finding in the *LiPuma* case could not have occurred before the settlement was brokered because Lipuma's counsel did not take any depositions and could not have reviewed any deposition transcripts from the *ELF* action because counsel in *ELF* did not take any depositions until *after* a settlement-in-principle was reached during the *LiPuma* mediation. *However, it appears that LiPuma's counsel may have, before the LiPuma mediation, received approximately 5000 pages of documents chosen by American Express, informally interviewed two witnesses, and received deposition transcripts of American Express representatives from the Schwartz v. Visa and Mastercard litigation.*

(*Id.* at 2 [D.E. 262] )(emphasis added).

After the settlement-in-principle was reached, and because of the intervenors'

participation, additional discovery was taken, including depositions of senior American Express employees knowledgeable about American Express' rate setting methodology and foreign currency conversion practices. Two separate mediations took place before two former federal judges. Those processes served to reinforce counsels' familiarity with the strengths and weaknesses of the case. The very real possibility that American Express would move to compel arbitration if the case were to proceed was hammered in.

Because the "parties have expended . . . [a sufficient] effort in analyzing the issues, this Court should find that the parties are at a proper juncture with sufficient information to settle this action." *Assoc. for Disabled Americans*, 211 F.R.D. at 470.

## III. *CONCLUSION*

Based on the foregoing analysis, it is ORDERED AND ADJUDGED that the proposed settlement is APPROVED as fundamentally fair, adequate and reasonable, and not the product of collusion among the parties. The Amended Complaint is DISMISSED with prejudice. The Court retains jurisdiction to enforce the terms of the settlement agreement, and reserves ruling on the issue of attorney's fees.[14] Any other motions are DENIED as moot and the Clerk is directed to mark this case as CLOSED.

---

14. Class Counsel submitted a memorandum in support of their application for attorney's fees [D.E. 269], with supporting affidavits and declarations. [D.E. 270–279]. If no additional objections exist to the award of fees in the amount requested, Class Counsel may apply for an award in the amount noted in their memorandum, or such other amount as is appropriate.